# STATE *v.* CLARK.

### (196 Pac. 360.)

**Criminal Law—Supreme Court Does not Determine Weight of Testimony or Compare Conflicting Testimony.**

1. It is not the duty of the Supreme Court to determine the weight of testimony, or to compare conflicting testimony introduced by the state and defendant, but simply to determine whether or not there was any testimony introduced by the state reasonably tending to show defendant killed deceased, and that such killing was manslaughter, of which defendant has been convicted.

**Homicide—Defendant Who Negligently Killed Deceased While Hunting Guilty of "Involuntary Manslaughter."**

2. If defendant fired his rifle at a deer or other object, and in so doing failed to use due caution and circumspection, and involuntarily killed deceased, defendant was guilty of "involuntary manslaughter" within Section 1898, Or. L.

**Homicide—Whether Defendant Killed Deceased and Whether Killing was Negligent, Jury Questions—"Due Care."**

3. In a prosecution for manslaughter, in view of the facts, it was for the jury to determine whether or not defendant shot and killed deceased while they were out hunting, and, if so, whether or not the killing was under such circumstances as to indicate a want of "due caution," the care which an ordinarily prudent man would exercise under the circumstances, so that the killing was negligent and defendant guilty of manslaughter within Section 1898, Or. L.

**Homicide—Refusal to Instruct on Manslaughter Erroneous Where Evidence Tends to Preclude Malice.**

4. If there is any evidence, direct or indirect, however slight, that tends in any manner to show that the killing was done under such circumstances as to preclude the element of malice, it is error to refuse to instruct as to manslaughter.

**Homicide—Instruction on Killing, Where Reasonable Inference was That No Injury Would Result, Faulty in Form.**

5. In a prosecution for manslaughter committed by defendant's shooting deceased while they were out hunting, defendant's requested instruction that if the jury should find beyond a reasonable doubt that the shot that killed deceased was fired by defendant, "but it might be reasonably inferred that no injury could result from such act of the defendant, then in that case the killing would not be manslaughter, but the act would be excusable," *held* faulty in form and properly refused.

---

2. Homicide by reckless or wanton use of firearm without express intent to inflict injury, see note in 5 **A. L. R.** 603.

**Homicide—Instruction That Jury Should Acquit if They Could not Determine by What Means Deceased Met His Death Properly Refused.**

6. In a prosecution for manslaughter committed by defendant's killing deceased while they were on a hunting trip, requested instruction that it might be impossible for the jury to determine from the circumstances by what means deceased met his death, and in such event it would be the duty of the jury to acquit defendant, was properly refused as either giving more than defendant was entitled to or as unnecessary.

**Criminal Law — Requested Instruction on Circumstantial Evidence Properly Refused as Otherwise Covered.**

7. In a prosecution for manslaughter committed by defendant's killing deceased while they were on a hunting trip, requested instruction that circumstantial evidence to be sufficient for conviction must be of a conclusive nature, etc., *held* properly refused as covered by another charge given.

**Homicide—Statements by Accused Tending to Identify Gun by Mark on Breech-block Admissible.**

8. In a prosecution for manslaughter committed while defendant and deceased were on a hunting trip, the sheriff was properly permitted to testify as to what defendant said, if anything, as to whether a particular weapon was the gun he had with him on the trip at the time, and as to whether there was any identification mark on the breech-block; such a mark being a chief point in the state's case to fix upon defendant as the guilty party.

**Criminal Law—Evidence of Sheriff as to Test Shell Fired in Defendant's Gun Admissible.**

9. In a prosecution for murder committed by defendant on deceased while they were on a hunting trip together, the state depending, to fix the crime on defendant, largely on a mark produced by the breech-block of his gun on shells fired in it, testimony of the sheriff, in regard to a shell with which he made a test in defendant's gun, that he had fired the shell and had kept it in its original condition, etc., *held* admissible for purpose of identification of gun.

**Criminal Law—Examination of Nonexpert as to Character of Photographic Process Improper, Being Matter for Jury.**

10. In a prosecution for murder committed by defendant on deceased while they were on a hunting trip, the state relying on an identification mark on the breech of defendant's gun to connect him with the crime, and introducing enlarged photographs of the breech-block and cartridge shells, where a witness not an expert on photography was asked by defendant's counsel whether he understood that the photographic proposition was just simply a shadow, all controlled by light and shades, etc., the state's objection to such line of examination was properly sustained; the fact sought to be elicited being one, generally known on which the jury was presumably as well informed as the witness.

**Criminal Law — Photographs of Scene of Hunt Harmless to Defendant.**

11. In a prosecution for homicide committed by defendant on deceased when they were on a hunting trip, admission of photo-

graphs showing the location of places traversed by searchers for decedent's body along the route which one or both of the hunters was supposed to have traveled, etc., *held* harmless to defendant.

**Criminal Law—Photograph of Locality Where Body of Deceased Found Including Body Admissible.**

12. In a prosecution for homicide committed by defendant on deceased while they were on a hunting trip, photograph of the locality where decedent's body was found, including the body itself, *held* admissible as any other map would have been, particularly where a medical witness was enabled by it to identify the body as that upon which he performed his autopsy.

**Criminal Law—Enlarged Photographs of Shells from Defendant's and Decedent's Guns Admissible.**

13. In a prosecution for homicide committed by defendant on deceased while on a hunting trip, photographs containing enlarged views of shells said to be those found where defendant shot a porcupine on the trip, the shells exhibiting a peculiar mark on the primer indicating they were fired from defendant's gun like the empty shell found near where the body was discovered, *held* admissible as presenting more clearly than the naked eye could discern the condition of the shell, enlarged photographs of other shells fired from decedent's gun being admissible in connection with the shells themselves to show they did not have the peculiar mark of those fired from defendant's gun, thus negativing any theory deceased might have been killed accidentally by a shot from his own gun, the fact the photographs were made without notice to defendant not affecting their admissibility.

**Criminal Law—Admission of Evidence Concerning Tests on Gun Shells Largely in Discretion of Court.**

14. The admissibility of testimony concerning tests, as the firing of shells in the gun of defendant charged with homicide, to determine whether they will show the same peculiar marks as the empty shell found near the body, rests very largely within the sound discretion of the trial court.

**Criminal Law—Homicide—Circumstances Sufficient to Justify Inference Defendant Fired Fatal Shot.**

15. In a prosecution for homicide committed by defendant on deceased while they were on a hunting trip, circumstances *held* to justify the jury in inferring that defendant fired the shot that killed decedent, the result being reached without basing one inference upon another, but by a series of independent inferences from a series of independent facts.

**Criminal Law—Testimony as to Severance of Branches by Impact of Bullet Admissible, and Harmless if Inadmissible—"Recently."**

16. In a prosecution for homicide committed by defendant on deceased while they were on a hunting trip, the state charging that defendant had fired through certain tree branches, testimony of a forester, in regard to certain severed branches of the trees standing between the body of deceased and the boulder where defendant stood, that when he found the branches they had been "recently" severed from the tree by impact without a knife, *held* admissible, "recently" being a relative term, expressing a condition and a fact;

and, if such testimony was inadmissible, it was rendered harmless by the subsequent introduction of the branches in evidence showing conclusively the severance had been by impact.

**Criminal Law — Testimony of Forester as to Stubs of Branches Severed by Bullet Being in Line When Bent Down Admissible.**

17. In a prosecution for homicide committed by defendant on deceased while they were on a hunting trip, the state claiming that defendant had fired through certain tree branches which had been severed by the impact of the bullet, testimony of the forester that the stubs of the branches were not exactly in line with each other, but by bending them down two or three inches, as they would have been before the branches were removed, they corresponded horizontally and vertically, *held* admissible.

**Homicide—Evidence Held to Justify Verdict of Manslaughter.**

18. In a prosecution for homicide committed by defendant on deceased while on a hunting trip, evidence *held* sufficient to justify verdict of manslaughter.

From Lane: GEORGE F. SKIPWORTH, Judge.

In Banc.

The defendant was indicted by the grand jury of Lane County upon a charge of murder in the second degree alleged to have been committed on July 25, 1919, by unlawfully, purposely, and maliciously shooting one Charles L. Taylor with a rifle. He was tried before a jury and found guilty as charged, but the verdict was set aside and a new trial granted; the reason given by the court for such action being that there was no evidence to justify the verdict. Thereafter he was again put upon trial and a verdict of manslaughter was rendered, accompanied by a recommendation for leniency. Upon this verdict he was sentenced to imprisonment in the penitentiary for a period of four years, from which judgment he has appealed to this court.        AFFIRMED.

For appellant there was a brief over the names of *Mr. J. S. Medley, Mr. A. C. Woodcock* and *Messrs. Weatherford & Wyatt,* with oral arguments by *Mr.*

*Medley, Mr. Woodcock* and *Mr. James K. Weather-ford.*

For the State there was a brief over the names of *Mr. L. L. Ray,* District Attorney, and *Mr. O. H. Foster,* with an oral argument by *Mr. Ray.*

McBRIDE, J.—1. The evidence in the case is purely circumstantial and covers nearly one thousand pages of manuscript. The appeal is based to a great extent upon the assumption that there is no evidence to justify the verdict, and a discussion of the principal points in the evidence adduced by the state is therefore necessary. The statement in the brief of the state consumes forty pages of the brief and would occupy a like space in the reports. The statement by defendant consumes twelve printed pages and both are in the main fair, although both are colored more or less by conclusions drawn by the respective counsel from the effect of the evidence rather than being a succinct synopsis of the testimony. Bearing in mind that it is not the duty of this court to determine the weight of testimony or to compare conflicting testimony introduced by the parties, but simply to determine whether or not there was any testimony introduced by the state reasonably tending to show that the defendant killed the deceased and that such killing was manslaughter, the writer presents this summary of the evidence which the state claims justified the verdict.

The scene of the killing was inside of the national Cascade forest reserve and a short distance west of the summit of the Cascade Mountains, upon the flank of what is known as Scott Mountain, a somewhat prominent peak the dome of which is situated about two and one-half miles in a northwesterly direction

from the nearest point on the county road leading from the McKenzie Bridge, which spans the McKenzie River about twenty-two miles below and southerly from the above-mentioned point, which is known as "Pole Bridge," and which by the road is about four miles in a southwesterly direction from the summit of the Cascade range. The road which leads across the Cascades into Eastern Oregon is within the Cascade forest reserve and at the time of the killing was being worked in the vicinity of Pole Bridge by the forest reserve authorities in co-operation with the Lane County authorities. Smith Taylor, not a relative of the deceased, was general superintendent of the work, and Charles L. Taylor, the deceased, had supervision of the work in the vicinity of Pole Bridge. In June, 1919, Charles L. Taylor had employed the defendant with his team to work upon the road, but later had discharged him for the real or alleged reason that the work should be given to taxpayers residing in the vicinity of the road.

The state, which prosecuted vigorously on the theory that the killing was not only done by the defendant but was one of purpose and malice, to show motive, introduced evidence which in some degree indicated that defendant was dissatisfied with the reason given for his discharge and resented it as unfair to himself. But as the verdict of the jury negatived a malicious or willful killing, that branch of the case need not be pursued further than to say that, while some evidence of a possible motive might be deduced, it is far from convincing to the writer, and it is evident that the jury took a similar view.

The verdict of manslaughter reduced the discussion of the facts to two propositions: (1) Did the

state introduce evidence tending to show that defendant shot Charles L. Taylor? (2) If that proposition is established, is there any evidence tending to show that the killing was under such circumstances as to constitute manslaughter as defined by Section 1898, Or. L., which reads as follows:

"If any person shall, in the commission of an unlawful act, or a lawful act without due caution or circumspection, involuntarily kill another, such person shall be deemed guilty of manslaughter."

These propositions involve a discussion of the circumstances attending the killing. On the morning of July 23, 1919, at the request of Smith Taylor, who was supervising the work, the defendant, who lived on what is called the Fraker place, four miles below McKenzie Bridge, started with his wagon and team to go to Pole Bridge to work. From McKenzie Bridge or near there he was accompanied by deceased, who also had a team attached to a road-grader. It was the understanding that there would be eight days' work excluding Sunday and including the time occupied in going and returning. Defendant took with him a 30–30 caliber Winchester rifle, which was the only gun in the crowd at the start, but after a discussion between deceased and defendant as to the necessity of securing "camp meat" deceased borrowed a 30–30 Winchester and seven cartridges from the Swartz brothers, who reside on the road at a place called "Lost Creek Ranch." In the company besides deceased and defendant were J. O. Lewis, Walter Boone, Doug Love, and Howard Wise, a sixteen year old nephew of deceased. There were on the wagon provisions for the party, and eight bales of hay deemed sufficient to feed the horses the nine days the party expected to be absent. After passing Lost Creek Ranch the party went on to a place called

White Branch and there camped for the evening. Here an evening deer hunt was planned by defendant and deceased but after a short hunt they returned to camp without having secured any game. The next day the party drove to Pole Bridge and camped, and defendant and deceased again started out to hunt, intending to remain out all night. Before starting they each discharged one shot from their guns for the purpose of obtaining empty cartridges to use as whistles in order to keep in touch with each other while hunting. Defendant says that he also fired two shots at a porcupine at the "dry lake" where they camped for the night, and later these two empty cartridge shells were found at that spot. They both bore the peculiar markings to which reference will hereinafter be made.

When Taylor left Pole Bridge with defendant was the last time he was seen alive by his associates. What the parties did thereafter depends wholly upon the statements of the defendant and the circumstances hereinafter detailed.

The defendant returned to the camp at Pole Bridge the next morning, which was July 25th, made no inquiry about his companion, declined to take coffee at a camp of engineers which was near his own camp where he prepared his breakfast, and went to work on the road, not coming in contact with any of his associates until after the lunch hour. When he met them at about 1 o'clock P. M. he did not say anything about deceased until Boone asked him where Taylor was, and he answered that he did not know, that they had separated in the morning and he had not seen him since, and gave no further account of the hunt or of the whereabouts of the deceased until that evening (July 25th), when in answer to ques-

tions by Boone he stated that he and deceased had camped on the south side of Scott Mountain by two little lakes (known in the testimony as "Tenas Lakes"); that in the morning they separated, Taylor to hunt toward the east and defendant toward the southeast; that they separated on the evening before when going in toward Scott Mountain and were to meet at a certain place on Scott Mountain; that defendant reached there first, and that they came together by means of a signal whistle.

Boone testified that as soon as the working party got in, that evening, defendant went immediately to his team. His testimony indicates that defendant displayed little anxiety at the prolonged absence of deceased. Doug Love testified substantially to the same state of facts. Howard Wise testified that after the working party came into camp that night defendant said that he did not know what had happened to Taylor, adding that he was too good a woodsman to be lost. He remarked that, "something has happened to him or he has been shot." Wise fired three signal shots with defendant's gun and later Doug Love fired one shot. It does not appear from the testimony of these witnesses that the shooting was suggested by defendant, and nothing beyond the expression above quoted indicates that at any time he showed any anxiety or emotion over the nonappearance of his hunting companion. So far as the state's testimony indicates, he was perhaps the most indifferent member of the party as to Taylor's whereabouts.

The next morning, July 26th, he went in company with J. O. Lewis to search for Taylor but instead of looking for him in the vicinity where Taylor would most probably have hunted, as indicated by the di-

rection taken by him when, as defendant claims, they separated, they went southerly to a trail or road leading from the main road in a northerly direction toward Scott Mountain and followed the main road to the vicinity of the lakes where defendant and Taylor had camped, but which camp they failed to find. Lewis, who accompanied defendant, was not a witness at the trial, being then an inmate of the state insane asylum. From somewhere in the vicinity of this camp they found a trail leading towards Deer Butte and followed this trail, which ran in a direction almost opposite from any course which Taylor would naturally have taken in returning from the place where defendant says they separated, and into a locality in which neither had hunted or proposed to hunt. After following this trail for awhile they found a trail leading off to the right with footprints of a man in it, and followed it for a mile and a half in an effort to locate a sheep camp supposed to be in that locality, with a view, defendant claims, of inquiring whether Taylor had come into the camp. Not finding the sheep camp, they returned to Pole Bridge. The defendant says that in the afternoon of the same day his feet were sore from walking and he mounted his horse and rode from camp, preceded by Lewis, northerly to Hand Lake, a distance of about half or three quarters of a mile, the country being comparatively open and the route easily followed. Defendant and Lewis then returned to camp.

We pause here to remark that an inspection of the map taken in connection with defendant's account of the separation of himself and deceased and the obvious route of the latter from that point toward Pole Bridge indicate that no intelligent man would have expected to find Taylor or his body in any of the

territory traversed by defendant and Lewis, and the jury may well have inferred, in view of subsequent testimony to which we shall refer, that he was deliberately leading Lewis away from the place where Taylor's body was later found.

We now return to subsequent occurrences, described in the state's testimony. Later in the afternoon of the same day, July 26th, James Sheasley, a forest guard, came to Pole Bridge camp with a party of searchers, and after some conversation with defendant asked him to go along for the purpose of pointing out the place where he and deceased had camped and to assist in the search. Defendant demurred at first, saying that he was "awful tired and worn and hungry," but finally consented to go on horseback up the road and Scott Mountain trail, previously followed by himself and Lewis, but was unable to or at least did not locate the camping place, took the party about a quarter of a mile past where the camping place subsequently proved to be, then turned back, and indicated a point which he thought was near where Taylor turned off to the left, and said he went in that direction, indicating the direction of Scott Lake, or rather a line between Scott Lake and Scott Mountain. The searching party took the direction suggested and searched through the woods to the head of Hand Lake, which is from one-half to three fourths of a mile north of Pole Bridge; but defendant did not accompany them, he had better return home as his horses were running short of feed. He was assured that it did not necessarily make much difference whether they had grain or hay, because there was plenty of grass around, but he persisted in his determination to go home and actually did so the next morning, July 27th.

Sheasley camped at Hand Lake the night of July 26th and next morning formed a party strung out so as to comb a section of the woods between Hand Lake and Scott Mountain and by that process of search found where a deer had been killed recently and dressed out, the head and entrails and other rejected portions being left on the ground. These remains were found at a distance of approximately a mile and a quarter in a northwesterly direction from the north end of Hand Lake and approximately a mile and a half northwest from Pole Bridge, the exact distance not being material.

The defendant, as before stated, left Pole Bridge on Sunday morning, July 27th, and arrived home that evening, taking with him Lewis, Boone and Howard Wise, the last named being a nephew of deceased who lived with deceased. By making a detour of about a mile he would have passed the home of deceased and have been able to communicate the facts to Mrs. Taylor; but, notwithstanding the lad expressed reluctance to break the sad news to the wife of deceased, defendant let the boy go alone to tell her of Taylor's disappearance, and did not himself go by or have any communication with her. The next day, Monday, July 28th, he received notice that he was wanted at the telephone by Smith Taylor, who had meanwhile gone to Pole Bridge, and went to the residence of deceased to answer the telephone. His wife was visiting at the home of deceased at the time. He was introduced to the mother of deceased, but never mentioned the occurrences connected with the disappearance of Taylor, nor did he inquire after the wife of deceased or ask to see her. He received a message from Smith Taylor requesting him to return to Pole Bridge and saying that there were some

things he had to tell him which he did not wish to talk about over the telephone. After hanging up the receiver the defendant spoke to his wife and said that Mr. Taylor told him, "that he had better come back, that suspicion on him was growing." He also said to Andy King the same afternoon, "It seems there is a rumor started up there that I know something about Charlie Taylor." He went back that day, arriving about dark, but never at any time inquired of Smith Taylor as to what he referred to when he telephoned him that he had something to tell him which he did not wish to talk about over the telephone.

Efforts to track the killer of the deer from the place where the head and entrails were found having proved unavailing, the combing party resumed operations by making a new swath, alongside the territory originally covered. The defendant on the morning of July 28th expressed a desire to take the party to the place where he and deceased had camped, but was told by Smith Taylor and Sheasley that it would be better for him to join the searching party which designed to pursue the combing method already begun. He consented, and accompanied them and the combing was resumed, the party as it afterwards proved having passed within eight hundred feet of the body of deceased. On its last trip during this search the defendant frequently insisted on discontinuing the combing process and going to the place where he and deceased had camped, and finally at his continued suggestions the combing process was discontinued and some of the party went with him to search for that place, which he found. The place where he fired two shots at the porcupine was also found. The party then returned to Pole Bridge, and on Wednes-

day morning, July 30th, defendant left the party for
his home, giving as a reason that he had some hay
to cut and that cutting could no longer be postponed.
On that morning a party consisting of District At-
torney L. L. Ray, Clyde R. Seitz, who had previously
been for twelve years supervisor of the Cascade
forest reserve, and Archie Slough, who had been a
forest guard on the reserve in the vicinity of Scott
Mountain, met the defendant on his way home and .
had a conversation with him in which he told them
the location of the camp site and of his course back
to Pole Bridge on the morning after the disappear-
ance of the deceased. Other people came to assist,
and the search was continued, but without success
until August 2d, when Harry Hayes, a merchant at
McKenzie Bridge, a former forest ranger and guard
and a woodsman of rare abilities, who was conduct-
ing an independent search, found the body of de-
ceased and by signals and otherwise collected the
searching party in proximity to where it was lying.

Before recounting the circumstances which took
place after the finding of the body and which we
think indicate that deceased was killed by a shot dis-
charged from defendant's rifle, we will discuss the
circumstances above detailed, and particularly the
conduct of defendant, to ascertain whether they in-
dicate a sense of guilt or a knowledge on his part
that an act of his caused the death of Taylor.

His conduct was unnatural and out of the normal
in not inquiring upon meeting with his fellow-
workmen whether or not deceased had returned to
camp. Almost the first question a normal man
would have asked would have been, "Has Taylor come
in yet?" As the hours wore on and deceased was
still absent it would have been natural for him to ex-

press some anxiety or at least surprise at his continued absence. His testimony indicates that he had left deceased at 7 o'clock A. M., a two-hour hunting walk from camp. Knowing that the duties of deceased as foreman in charge of the road work required his presence and with the understanding that he would be in camp at Pole Bridge by 9 o'clock A. M., the most natural thing in the world would have been when deceased failed to appear at 1 o'clock to express some surprise, or at least to mention the fact. Instead of this, according to the state's testimony, he was as mute as his dead companion until asked concerning Taylor's whereabouts, and then only briefly stated that he had separated from him in the morning and had not seen him since, with no expression of anxiety or curiosity as to his non-appearance. This conduct was not normal. The time went on until at 5 o'clock, when the party began to grow anxious, he expressed some anxiety and said that, "he is too good a hunter to get lost; he must have met with an accident or been shot," but he did nothing, unless possibly permitting other members of the party to fire signals with his gun was action on his part. We have already alluded to defendant's perfunctory search with Lewis on the next day. If, as he claimed, he knew nothing of Taylor's whereabouts, and if, as he had suggested the evening previous, he had fears that some accident had befallen him, he was confronted with a situation that required prompt and energetic action. If his surmise were not feigned, he had good reason to fear that his friend and hunting companion might be lying in the forest north of Pole Bridge injured and dying from hunger and thirst, and yet he followed a trail into a territory where he must have known that it was very

improbable Taylor would have traversed; did not leave the trail to search in the woods, and finally re-. turned to camp. In the afternoon, complaining of sore feet, he made another expedition into improbable territory along and through open country where an accident would be improbable, and again returned to camp. A real, red-blooded man would have sought his hunting companion bare-footed, under the circumstances, and defendant's attitude, taken in connection with the evidence hereinafter discussed, indicates that he had no wish to find Taylor's body and no desire that anyone else should find it. In addition to this he gathered up his things the next morning and on the plea that his horses might be short of feed, left for home with two bales of hay and some barley yet unused, leaving the rest of the party to continue the search. It is no wonder, as he said to his wife, that "suspicion was growing" among his fellow-workers. Upon his return to Pole Bridge in answer to the telephone message from Smith Taylor his conduct was equally abnormal. He found in progress a combing process that must in all probability have led finally to a discovery of the body had it been continued, but instead of cheerfully engaging in it he was continually suggesting an expedition to where he and deceased had camped, and finally induced a cessation of the search in the method then being pursued and persuaded the searchers to go with him to that locality which he found without difficulty, although he professed to be unable to find it when he went with Lewis in search of it. The visit to this camp having been barren of results, he returned to Pole Bridge, and the next morning unconcernedly left the searching party and went home to cut hay, leaving the body of the companion

whom he had hunted with, camped with and eaten
with, to rot in the woods. This is abnormal conduct,
inconsistent with the duties which the defendant
owed to his companion and his family under the cir-
cumstances, and can be accounted for only on the
assumption that he possesses a mental organization
callous to the claims and duties of ordinary human-
ity, or that overpowered by a sense of guilt he
shunned the scene of the crime and sought to cover
it up by misleading those who were seeking to dis-
cover Taylor's body and ascertain the cause of his
death. We do not contend that the circumstances
above detailed are sufficient either singly or in the
aggregate to establish the fact that the defendant
either by design or misadventure killed the deceased,
but taken in connection with the facts discovered
after the finding of the body they are of such weight
as in our opinion to justify the verdict rendered in
this case.

We will now consider the circumstances attending
the finding of the body and subsequent thereto. The
body was discovered lying on a bench of land south
of which at a distance of approximately seventy-
three feet at the nearest point is an abrupt bluff or
"rim-rock" as it is called in the testimony, which is
probably eight feet in height and of which the gen-
eral direction is approximately from northwest to
southeast. At a point almost directly south of the
body this rim-rock makes a curve to the north and
runs for twenty-five or thirty feet on a tangent
almost directly east. Here it again curves to the
north for about the same distance, then again makes
a curve and runs approximately south of east for
perhaps twenty feet or more. At this point there is
situated on the summit of the rim-rock a boulder

which is ninety-three feet in a southeasterly direction from the location of the body. The boulder is about two feet in height and of sufficient diameter for a man to stand upon it conveniently. In a direct line from the boulder to the body is a small tree from six to ten inches in diameter and from ten to fifteen feet in height, with the top broken off, the foliage, though much withered at this time, indicating that it is a mountain hemlock. The limbs of this tree bend toward the ground from the weight of the winter's snows, which are necessarily heavy at that high altitude. The accompanying map is a fairly accurate portrayal of the *locus in quo* and the position of the body.

The body was lying about northwest of this tree, perhaps six feet distant, with the feet nearest the tree and almost under the branches. The head was toward the northeast. The feet were almost in a line drawn from the boulder before mentioned through the branches of the tree and from six to ten

inches to the left of the trunk looking in a north-
westerly direction from the boulder. At this dis-
tance from the trunk and practically in line with
each other at a height of more than fifty inches from
the ground were several stubs of limbs which had
been newly severed from the tree, these stubs being
approximately ten to twelve inches long by a meas-
urement which excludes their curve, which is consid-
erably downward owing to the pressure of the heavy
snows in that region. Lying entangled in other
branches or upon the ground were recently severed
branches approximately the stubs left upon the tree,
the severance not having been made by any sharp in-
strument but by impact and evidently by a bullet
fired from above. Another branch practically in line
showed a nicked place evidently made by a bullet.
From where the deer head and entrails were found
this was about eighteen hundred feet in a northeast-
erly direction and it is evident that when deceased
was shot he was traveling in a northeasterly direc-
tion, which would place the tree on his right hand.
He was shot in the right shoulder-blade, the ball
ranging downward and to the left as shown by the
following facts: The shoulder-blade exhibited a hole
made by the bullet. In the fleshy part of this wound
were threads of wool from the sweater worn by de-
ceased, which evidently had been drawn into the
wound by the ball. This wound was from an inch to
an inch and a half in diameter. That the ball had
passed through the shoulder-blade from without was
indicated by the fact that pieces of bone had been
driven into the cavity of the body. The bullet, con-
tinuing its course, had passed into the descending
*vena cava*, which is the vein returning to the heart
all the blood from the head, neck and upper extrem-

ities and all that part of the chest above the heart. Inside of the *vena cava* was found the steel jacket of a 30–30 bullet. The fifth rib was cut in two, evidently by a bullet, but as the body was in an advanced stage of decomposition the bullet was not found. The surgeon who made the autopsy was unable to find anything upon the left side of the body which he could identify as an exterior wound, although there were several apertures swarming with maggots, but these apertures he attributed to decomposition and attendant conditions. No unprejudiced person can read the testimony without being satisfied that the shot which killed deceased was fired from above the rim-rock and by somebody standing upon or near the boulder referred to.

The evidence indicates that deceased was an experienced hunter and that his customary method of preparing the carcass of a deer was to cut off the head and hind feet, open the upper part of the body and take out the entrails, skin the forelegs to the knee, and cut apertures in the gambrels so as to admit the remaining loose forelegs to be passed through these, making a pack which he carried upon his back with his arms through the loop made by the process above described and which produces practically the same effect as the pack-straps upon a soldier's knapsack. The load is carried with the hams hanging down, which with a man of Taylor's height would bring the neck of the deer up to about the back of his head. A large buck thus prepared, and without doubt the same deer of which the head and entrails were found about eighteen hundred feet southwesterly from the body was upon his shoulders in the form of a pack when his body was found. He was traveling evidently in an easterly direction, probably

intending to intersect what is called the "lava trail," which led from farther north down in a southerly direction to Hand Lake and thence to camp. The route from where he had killed the deer to where he met his death was evidently the easiest way to reach this trail, as farther south was a burn where the fallen trees rendered traveling more difficult. Upon the bench or comparatively level space near the body there were growing very few trees of any considerable size, but mostly scattered young firs from two to four or five feet high and lower huckleberry brush. Between the tree above mentioned and the boulder the ground was comparatively open, not so open, perhaps, that one standing on the ground immediately at the edge of the rim-rock could see an object the height of a man or a deer near the tree below, but by standing on the boulder he could see an object on either side of the tree. Having shown that the state's evidence tends to prove the fatal shot was fired from the boulder or from its immediate vicinity, we will now discuss the circumstances tending to show that the defendant fired the fatal shot.

It will be remembered that defendant and deceased were both carrying guns of the same make and caliber, 30–30 Winchester rifles, and that they were both using the same kind of ammunition, 30–30 cartridges with steel jacketed soft-nosed lead bullets, the cartridges perhaps most commonly used by hunters, and ordinarily it would have been impossible to identify by the cartridge the gun from which it was fired. In the case at bar that difficulty was surmounted by certain physical facts which cannot be disputed. At the boulder heretofore mentioned the witness found at the base of it an empty 30–30 shell, and another

empty shell was taken from the barrel of the rifle of deceased, both of which bore on the brass part of the primer a peculiar mark evidently caused by a flaw in the breech-block of the gun from which they had been fired. The primer of a Winchester shell is composed of two parts, one, the outer rim of the primer, being brass, and the center portion where the firing pin strikes being copper. The copper center is approximately the diameter of an ordinary pin head, while the brass portion would measure 3/16 of an inch across, including the copper center. The brass rim from the exterior of the copper center to the exterior of the brass portion will measure something less than 1/16 of an inch. When the firing-pin strikes the primer in discharging the gun the primer is driven slightly in and below the general surface of the butt of the cartridge, but the explosion, which causes a pressure of about 32,000 pounds to the square inch, drives back the brass part of the primer against the breech-block, leaving it flush with the butt of the shell. But the copper portion, being held by the firing-pin, is not so pressed back. The result of this enormous backward pressure upon the primer is to stamp upon it the mark of any flaw or protuberance that may be upon the breech-block. If there is a depression, the primer will show a protuberance, and *vice versa.* In this case the flaw had caused a very slight, almost microscopic protuberance in the primer of the shell, which enlarged photographs make very clear to the naked eye, although it is difficult to discern the mark without the aid of a microscope or such photographic enlargements. A careful examination of the shell found at the base of the boulder disclosed the mark upon the brass portion of the primer and this was compared with two

shells found where defendant had shot the porcupine on the evening when he and deceased had started out to hunt, and identical marks were found upon these. Later several shells were fired from defendant's gun and that weapon was found to produce the same mark. The extractor of a Winchester rifle makes a little scratch upon the inside of the rim of the shell in the process of throwing the cartridge from the barrel. The extractor of defendant's gun was found to make a sort of double scratch, while the rifle of deceased made only a single scratch, thus negativing the theory that deceased might have been accidentally shot with his own gun. Another singular circumstance developed: When the body of deceased was found, his rifle was lying by his side and in the barrel was an exploded shell. An examination of this shell disclosed the fact that it had the same flaw mark upon it that was produced by defendant's gun, and subsequent tests disclosed the fact that the gun of deceased produced no such mark in the process of firing. More than this, an examination of the shell disclosed that the inner rim of the cartridge showed that it bore, not only the extractor mark made in taking it out of the barrel when it was found, but another extractor mark, indicating that it had been taken from the barrel of some other gun before being placed in the barrel of defendant's gun. This is far from being a complete *résumé* of the state's testimony or even of the circumstances tending to connect the defendant with the commission of the crime. If the shell found by the boulder was one from defendant's gun, and the evidence indicates that it was, this, coupled with the fact that nobody had handled or hunted with the gun except himself, is strong evidence that he was present and fired the shot that

killed Taylor.    There was no other way in which an
empty shell from defendant's gun could have got into
the barrel of Taylor's gun after he was shot except
that defendant put it there, and the jury was en-
titled to infer that he did, probably with the hope
that the body would not soon be discovered and that
when in after months or weeks it might be found,
the remains would be in such condition that an in-
ference might be drawn that Taylor had met his
death from his own gun by some accident.

We shall next discuss the question as to whether
the killing was under such circumstances as to
justify a verdict of manslaughter.    As before re-
marked, there was some evidence of resentment by
defendant against deceased, but it was not very
strong, and what ill feeling defendant had enter-
tained had apparently died away.    If defendant har-
bored it, he did not exhibit it on the trip, and the
relations of the parties seemed so kindly that it
hardly appears probable that defendant intentionally
committed the homicide.    Indeed, if such had been
his intention and he had been lying in wait to com-
mit murder, it seems very improbable that he would
have taken a chance shot through the branches of
a bushy tree to effect that object.    However, the
verdict of the jury has acquitted defendant of the
charge   of   intentional   homicide,   and   unless   the
evidence tends to indicate a careless or negligent
shooting, the verdict must be set aside.    The facts
above recounted indicate at least that defendant
fired through the branches of a bushy hemlock tree
at an object which he could not see or at least could
not see clearly.    To do this under any circumstances
would seem at first blush to be negligent.    There is
little proof of the assertion by defendant's counsel

that "several hunters were known to be in proximity to Scott Mountain"; but if this were the fact, it furnished an additional reason for caution on the part of the defendant in shooting at objects not clearly visible. The court was exceedingly careful of the rights of the defendant in respect to manslaughter. It was careful to instruct the jury in substance that the fact that the defendant was hunting out of season and therefore unlawfully and that while doing so he accidentally shot the deceased, would not render the killing unlawful within the meaning of the statute. This seems to be the law; at least, it became the law of this case. The court further instructed the jury as follows:

"If you find beyond a reasonable doubt that the defendant, Martin A. Clark, in July, 1919, in Lane County, Oregon, fired his rifle at a deer or other object and in firing at a deer or other object, if he did so fire, he failed to use due caution or circumspection, and involuntarily killed Charles Taylor, then the defendant would be guilty of involuntary manslaughter."

2. This instruction clearly stated the law.

The court continued as follows:

"I instruct you that homicide is manslaughter even though committed in doing an act lawful in itself, if the defendant was guilty of gross negligence and such was the cause of the death, but the negligence must have been gross under the circumstances. A person cannot be guilty of manslaughter under the statute to which I have called your attention, unless that person is guilty of gross negligence; a mere mistake, however, where there is not gross negligence is not manslaughter."

3. In this instruction the court not only guarded the rights of the defendant, but went further in that

direction than the law warrants. "Due caution" is that care which an ordinarily prudent man would exercise under the circumstances, and the want of that due care is negligence without any qualifying terms, although one court at least has held that the word "caution" implies a greater degree of care than the word "prudent": *Eggett* v. *Allen,* 106 Wis. 638 (82 N. W. 556). Be this as it may, it is clear that the court went to the limit in protecting the defendant from an inconsiderate verdict. The jury first had the peculiar conduct of the defendant as indicating that abnormal state of mind which those familiar with the psychology of crime denominate evidence of a sense of guilt. The evidence then carried the jury step by step over the ground, and by the testimony of witnesses and maps and photographs the prominent features of the region were brought before it so to present a mental picture which could only have been made clearer by taking the jurors physically through that territory. By the same means they were made vividly acquainted with the scene of the killing and its surroundings. The peculiarities of the shells found were pointed out to them by expert witnesses and made clearer by enlarged photographs. The writer has seldom seen or had occasion to review a case more clearly presented or more ably and skillfully defended. It is safe to say that the jury had all the facts and from these facts it was for it to determine whether or not defendant shot and killed Taylor, and if so, whether or not the killing was under such circumstances as to indicate a want of due caution, a negligent killing.

4. We are not presuming to weigh or compare conflicting evidence, we have no authority to do so,

and have referred only to portons of the state's
evidence in order to demonstrate that there was
*some* evidence introduced by the state upon which
a jury could base a verdict of manslaughter, and
that therefore the court was justified in instructing
it upon that feature of the case. The rule in this
state is that, if there is any evidence, direct or
indirect, however slight it may be, that tends in
any manner to show that the killing was done under
such circumstances as to preclude the element of
malice, it is error to refuse to instruct as to man-
slaughter: *State* v. *Magers*, 35 Or. 520 (57 Pac. 197).
The authorities are all collated in that opinion and
further citations are unnecessary. The fact that,
as some of the state's evidence indicates, the de-
fendant after the commission of the act endeavored
to conceal it, does not necessarily show malice in
committing it. A timid man, having incautiously
shot another, may take counsel of his fears and
deny the act and endeavor to conceal it, not from
fear of being punished for a malicious killing, but
from the apprehension that he may be punished
for a negligent killing. This would be especially
true in a case like the present, where if the de-
fendant acknowledged the killing, he would neces-
sarily be compelled to admit that at the time it
occurred he was breaking the laws by hunting out
of season, an offense that is itself subject to quite
a severe penalty.

We will now consider the objections to the ruling
of the court on other questions presented in the
record. The assignments of error from I to IX,
inclusive, relate to the submission of the question
of murder in the second degree to the jury, and
hence have already been disposed of.

5. Assignment X is predicated upon the refusal of the court to give the following instruction:

"If you should find from the evidence in this case, beyond a reasonable doubt, that the shot that killed Charles L. Taylor was fired by the defendant, Martin A. Clark, but it might be reasonably inferred that no injury could result from such act of the defendant, then in that case the killing would not be manslaughter, but the act would be excusable."

This instruction, while not given in the language of the request, was substantially covered by the folfowing charge:

"If he is guilty of manslaughter as I have defined manslaughter to you, that is, doing a lawful act without due caution, or circumspection, then he would be guilty of manslaughter. If you have a reasonable doubt as to whether he killed Taylor at all and if you have a reasonable doubt as to whether he committed manslaughter as I have defined manslaughter to you, then it would be your duty to return in to court a verdict of not guilty."

The instruction requested was faulty in form and should not have been given. The act referred to is that of firing the shot that killed Taylor. If defendant when he fired the shot, acting as a prudent and reasonable man, thought at the time that no injury could result, he was not guilty, and this the court substantially told the jury in the instruction quoted and in the following:

"If you have a reasonable doubt as to whether the defendant in Lane County, Oregon, did the act charged, or a reasonable doubt as to whether the act, if committed at all, was committed between July 1, 1919, and October 15, 1919, the date of the filing of the indictment, or a reasonable doubt as to whether the act, if done at all, was done without due caution or circumspection, or a reasonable doubt

as to whether the killing was done by the defendant, then in such events, or in either of such events, you would be entitled to find the defendant not guilty of manslaughter under the statute to which I have just called your attention.''

The instruction requested is loosely drawn, not confined concretely to an inference drawn by defendant or which ''might be'' reasonably drawn by him, whereas the instructions given are in the concrete and, taken as a whole, clearly state the law so that the jury must have fully understood that, if a reasonably prudent man would have fired the shot under the same circumstances, it could not convict the defendant.

6. Assignment XI predicates error upon the failure of the court to give part of a requested instruction, the omitted portion being as follows:

''It may be impossible in this case for the jury to determine, from the circumstances, by what means the deceased met his death, and, in that event, it would be the duty of the jury to acquit the defendant.''

It would have been highly objectionable for the court to go into the business of prophesying what might happen in the jury-room. In the general charge the jury was fully instructed that it must be satisfied beyond a reasonable doubt that the deceased came to his death by a gunshot wound inflicted by defendant either maliciously or by an act done without due caution or circumspection, and this in one form or another was reiterated. If the charge requested meant more than this, it was more than defendant was entitled to. If it meant the same thing or less, it was unnecessary. The following instruction given by the court in itself contains

99 Or.—42

everything that the defendant was entitled to ask on this subject:

"Circumstantial evidence, to be sufficient for a conviction, in this case, must be of a conclusive nature; that is to say, its tendency must be not only to convince the minds of the jury of the defendant's guilt, beyond a reasonable doubt, but to exclude the supposition that the deceased Charles L. Taylor lost his life, in some other manner than at the hands of the defendant, and each fact necessary to the conclusion sought to be established must be proved by competent evidence, to your satisfaction, beyond a reasonable doubt. And if you have a reasonable doubt, or if you are unable to determine from the evidence the circumstances or by what means the deceased met his death, in that event it would be your duty to find the defendant not guilty."

7. Error is also predicated upon the failure of the court to give the following requested instruction:

"Circumstantial evidence, to be sufficient for a conviction in this case, must be of a conclusive nature, that is to say, the tendency must be not only to convince the minds of the jury of the defendant's guilt, but to exclude the supposition that the deceased, Charles L. Taylor, may have lost his life in some other manner than at the hands of the defendant, and each fact necessary to the conclusion sought to be established must be proved by competent evidence to the satisfaction of the jury beyond a reasonable doubt."

This is fully covered by the instruction above quoted and by the general charge.

8. Another assignment is based upon the court's allowing Sheriff Stickels to answer the following questions:

"Q. What did Mr. Clark say, if anything, as to whether that was the gun he had with him on the trip up in the mountains at that time?

"A. He said that was the gun. * * He said this is the gun he had with him on the trip up with the road crew at Polo Bridge. He also said that it was. the gun he had hunting with him on the trip.

"Q. Is there any identification mark on the breech-block?

"A. There is a mark on this block, yes, sir. There is a little scratch or mark made by E. F. Martin, the photographer, on the back of the block.

"Q. State whether or not that mark is anywhere where it would come in contact with the cartridge when the gun is loaded.

"A. The mark is on the exact opposite end of the block from where the shell rests."

It is difficult to determine to what part of the testimony the objection refers. It was clearly proper to allow the witness to testify that defendant stated that the gun exhibited was the same one which he had with him on the hunting trip. When the circumstances are recalled, it is apparent that the other questions asked were proper. A photographer had placed a mark of identification on the breech-block. The state was contending that there were certain marks on the head of the block that reproduced themselves on the cartridges when fired. It was therefore important to , distinguish the mark made by the photographer from those claimed by the state to have been on the gun originally, in order to avoid the possibility that the jury would confuse them. The testimony could have worked no possible injury to defendant's case in any event.

9. Error is also assigned upon the court's allowing the same witness to answer questions in re-

gard to a shell introduced in evidence. The questions were preliminary in character and the witness was allowed to testify that it was a loaded shell when he took it from the magazine of Clark's gun; that thereafter he fired it to make a test (presumably to discern whether or not it would display the peculiar markings said to result from firing shells in Clark's gun) and that he had kept it in its original condition in his possession until it was introduced in evidence, except that it was somewhat corroded. We see no objection to the testimony. We will consider later the question of the admissibility of this and other test shells in evidence upon objection on other grounds. We are here dealing with the matter of identification.

10. Another objection urged to the ruling of the court in regard to certain testimony of the witness Stickels, who had testified to being present when certain enlarged photographs were made of the breech-block and certain cartridge shells said to have been taken from the defendant's gun or found in the vicinity of Taylor's body, is disclosed by the following colloquy between the witness and counsel on cross-examination:

"By Counsel for Defendant: You understand, Mr. Stickels, that this photographic proposition is just simply a shadow; it is all controlled by light and shade?

"A. Yes, that is true.

"Q. You understand that by just light and shade you can magnify and enlarge a defect or an apparent defect?

"A. I understand that all right.

"Q. That is a fact, isn't it?

"A. Yes, sir.

"By Counsel for the State: We object to that. We did not ask a thing on earth about that.

"By the Court: The objection is sustained.

"By Counsel for Defendant: He has testified in regard to how these photographs were taken.

"By the Court: He is not an expert on photography. The objection is sustained."

This indicates that every question was asked and answered without objection except the last, "That is a fact, isn't it?" How far the court's ruling went is problematical, as the testimony was not stricken out. In any event, the objection was well taken, both for the reason that the witness was not an expert, and that the fact sought to be elicited was one well known generally and upon which the jury was presumably as well informed as the witness.

Another objection was to a question asked the same witness as to how long defendant was kept in jail without being permitted to see counsel. The objection was properly taken at that stage of the case. Later the witness was cross-examined thoroughly as to the interest he had taken in the case, from which it appeared that he had been very zealous in following up supposed clues indicating or supposed to indicate defendant's connection with the shooting, and had been in consultation with the state prosecutor during the trial.

11, 12. There is a group of objections concerning the introduction of certain photographs offered by the state. The first refers to the photographs showing location of places traversed by searchers along the route which one or both of the hunters were supposed to have traveled; one, for instance, where defendant and deceased made their camp, another of the "dry lake" where the defendant shot the porcupine, another of the locality where

the deer·head and entrails were found, and another
of the place where the body was found.  The pho-
tographs, excepting perhaps the last, added litttle
or nothing to the force of the testimony and their
introduction could just as well have been omitted
perhaps, but it could have worked no possible in-
jury to defendant.  Photographs of McKenzie
Bridge where the party crossed, or of Lost Creek
Ranch where Taylor borrowed the gun, might have
been useless; but what harm they or any other
pictures would have done defendant the writer is
unable to perceive.  The intent of all the testimony
was to take the jury mentally over the ground
traversed by the parties in the hunt.  A description
of the scenery along the route, while no doubt in-
teresting, although it served no useful purpose,
worked no injury.  As to the photograph of the
locality including the body, the condition is different.
It was shown that no changes had been made in
the position of the body· or the surroundings, and
this gave the jurors an opportunity which they
otherwise could have had only if they had been present
at the time the photograph was taken, to obtain
a correct idea of the ·situation as it was disclosed
therein.  It was in effect an inerrant map of the
locality drawn by the subtle forces of sunlight, and
was admissible as any other map would have been.
By referring to it, Dr. Beardsley, who had not
known deceased during his lifetime, was enabled
to identify the body there shown as the same body
as that upon which he performed the autopsy.  He
was also able to say from inspection of the photo-
graph that the body was in the same position as
shown in the picture, when he performed the au-
topsy, and this, taken in connection with other

testimony showing that it had not been moved up to the time the picture was taken, indicated that the body had remained undisturbed and in the same position in which it fell, when he began his autopsy. The county surveyor who made the map included in this opinion was able to recognize the locality later by this photograph and set his transit accordingly. But even if photographs had not been used for these purposes, we are of the opinion that they were admissible for the same general reason that any. map of the locality shown to have been drawn carefully, would have been admissible. There was nothing in the pictures grewsome or calculated to excite the passions of the jury. The deceased was shown lying as a tired man might have lain. There were no wounds displayed or anything to shock the sensibilities or to awaken prejudice. The exhibit was wholly different in purpose and intent from that commented upon in *State* v. *Miller,* 43 Or. 325 (74 Pac. 658), the sole purpose of which was to show certain ghastly. wounds the infliction of which by the defendant was not denied and the location of which was adequately shown by the testimony of witnesses. The ruling in the case at bar is supported by *State* v. *Finch,* 54 Or. 482 (103 Pac. 505).

13. Another group of photographs contains enlarged views of certain cartridge shells said to be those found where defendant shot the porcupine and which are no doubt cartridges thrown from his gun on that occasion, the cartridge found at the boulder, as before stated, the cartridge found in the gun of deceased, test shells from bullets fired from defendant's gun and like shells fired from the gun of deceased. As said before, the shells fired from de-

fendant's gun exhibited a peculiar mark on the brass part of the primer, indicating a mark or flaw in the head or front end of the breech-block. These marks are indistinct when viewed on the cartridges themselves, but in enlarged photographs of the butt of the cartridge they are plainly visible. We see no objection to the introduction of these enlargements. They presented more clearly to the jury the condition of the cartridge shells than the naked eye would be able to discern. Enlarged photography for like purposes and for scientific uses is constantly employed. In astronomy especially it has been the means of the discovery of stars and nebulae so remote that even the strongest telescope has not been able to bring them within the range of human vision. In the detection of forgeries and counterfeits it is a common and useful agent.

"It is no objection to the admissibility of a photograph that it is enlarged, showing the subject or object magnified, where this does not have a tendency to mislead. Photographs of instruments already in evidence which are so enlarged as to make the proportions plainer and to illustrate the testimony of witnesses may go to the jury in the same way as would a magnifying-glass or microscope"; 22 C. J., § 1121f, citing many authorities.

For the same reason, enlarged photographs of other shells fired from the gun of deceased were admissible in connection with the shells themselves for the purpose of showing that shells fired from Taylor's gun did not have upon them that peculiar mark imprinted upon those fired from defendant's gun, thus negativing the theory that Taylor might have been killed accidentally by a shot from his own gun. The fact that the photographs were made without notice to defendant did not affect their admissibility:

22 C. J., § 1123. We are of the opinion that both the photographs and the shells themselves were properly admitted in evidence.

14. As to the test shells fired by the sheriff, they were fired from the same guns used by the defendant and the deceased upon the hunt; their possession was traced from the time that they came into official custody until the experiments were made, and there is no doubt as to their having been practically in the same condition. In fact, the marks made upon the primers strongly tend to show that the condition of the breech-blocks had not materially changed since the time that defendant shot the porcupine and the deceased killed the deer. The hard steel of a breech-block is not liable to sudden changes when in disuse, unless it is intentionally disfigured, of which there is not the slightest evidence in this case. The admission of testimony concerning tests of this character rests very largely within the sound discretion of the court: *State* v. *Holbrook,* 98 Or. 43 (188 Pac. 947). That discretion was properly exercised in the case at bar. The tendency of this testimony was to prove that the cartridge that was found near the boulder was from the defendant's gun. As nobody but defendant was in possession of the gun, except when signal shots were fired in camp in his presence, the fact of finding the cartridge at the boulder gave rise to another inference that he must have been there and fired his gun.

15. The fact that the path of a bullet from the boulder to the place where Taylor was found was traced through the boughs of the tree behind which he was killed and in such a line that it appeared most probable that it had been fired by somebody standing on the boulder or in its immediate vicinity,

created an inference that the bullet which killed Taylor came from the cartridge found at the boulder. Taking all these circumstances together, the jury had a right to infer from them that the defendant fired the shot that killed Taylor, and this without basing one inference upon another inference, but by a series of independent inferences from a series of independent facts. One fact may give rise to a single inference, or it may give rise to several inferences, or a logical conclusion may be drawn from a multitude of detached circumstances so related to each other and to the fact to be proved that it would be illogical to assume that they could all exist coincidentally and the fact in dispute be nonexistent. Similarly, the fact that one of the defendant's exploded shells with the mark of the extractor of defendant's gun upon it was found in the barrel of Taylor's gun, was some evidence that it got there by defendant's agency. It is true that this is not the only inference that might be drawn from the circumstances, but it is a fair inference under the conditions and one which the jury had a right to weigh.

This case is not like that of *State* v. *Hembree*, 54 Or. 463 (103 Pac. 1008), relied upon by counsel for defendant. In that instance the defendant was accused of killing his wife and daughter. There, the state to prove a motive for the killing assumed that defendant had been having illicit relations with his daughter and had committed the crime charged in order to prevent the results from being known. To sustain this, the prosecution introduced the keeper of the hotel where the daughter had been staying, who testified that the defendant visited his daughter's room in the evening (which was certainly not in itself a circumstance indicating guilt); that after a

short time he went away; and that the next morning the witness saw stains upon the sheet which he thought were caused by semen. This was the substance of the testimony. Without any expert testimony, the jury was asked by counsel for the state to infer that the stains upon the sheet were human semen; that the defendant emitted them; that pregnancy resulted therefrom and that defendant to protect himself from disclosure murdered his wife and daughter. Each inference was a *non sequitur*, and had no foundation upon which to rest. This court refused to tolerate such a piling of inferences upon each other and pointed out that not even the principal fact upon which they were supposed to rest had been proved.

16. It is also urged that the trial court erred in permitting the witness Seitz to testify in regard to certain severed branches of the tree standing between the body of the defendant and the boulder, that when he found the branches they had been recently severed from the tree; that this had been effected by impact and that there was no indication of a cut with a knife. "Recently" is a relative term, but expresses a condition and a fact. It is true that the branches and the stubs from which they were cut were in court and later were introduced in evidence, but the killing happened in July, 1919, and the trial took place in July, 1920, so that in their withered and dried state the branches would furnish no evidence of the condition in which they were when the witness found them. They were afterwards introduced in evidence and showed so conclusively that the severance had been by impact that no injury could have resulted from the witness' testimony to that fact. The witness was a forester of twelve

years' experience and presumably had learned enough in that time to be able to say whether a branch had been recently severed from a tree.

17. Objection was also made to testimony by Seitz to the effect that the stubs of the severed branches were not exactly in line with each other as they showed upon the tree, but by bending them down two or three inches they corresponded horizontally and vertically. The point made by the state as to the significance of this testimony is, that the weight of that part of the branch outside of the point of severance, together with the foliage thereon, being removed, the portion of the branch next to the tree, being thereby relieved of its weight, would spring up to a position nearer at right angles to the trunk than it occupied before the end of the branch was severed. The witness found that by so bending down the stubs they corresponded in curvature with the branches and were in line with each other. We see no objection to this testimony. The witness told what he saw, and his experiment was simply directed as nearly as possible to the reproduction of original conditions. Had the jury been trying the case upon the ground recently after the killing, it would no doubt have made a similar investigation. The whole testimony leaves no doubt in any unprejudiced mind that the shot that killed Taylor passed through the foliage of this tree and severed these branches.

18. We have thus considered enough of the state's testimony to convince us that there was evidence adduced by the state to justify a verdict of manslaughter, and our examination of the record satisfies us that nothing in the rulings or instructions of the court discloses reversible error.

It is due to the defendant to say that some of the testimony here recounted was contradicted by him and his witnesses; but we are precluded from weighing or comparing contradictory testimony. That was the exclusive function of the jury. But after a long and patient examination of the whole testimony the writer is forced to the conclusion that it almost conclusively indicates that deceased met his death by a shot fired from defendant's rifle. If this was so, it was for the jury to say whether the killing was the result of previous ill feeling on the part of defendant, or was merely through defendant's lack of caution in firing through the foliage of a tree at an object which he could not clearly discern, when due caution and circumspection would have demanded that he withhold his fire until he had made further examination. The jury charitably, and we think properly, adopted the latter view; and, while the consequences are serious and even lamentable to the defendant and his family, we have no right to disturb its verdict.

The judgment is affirmed.        AFFIRMED.

Mr. Justice BROWN took no part in the consideration of this case.