Argued February 11; affirmed April 7; rehearing denied
June 23, 1942

# STATE *v.* BEAVER PORTLAND CEMENT CO.

(124 P. (2d) 524, 126 P. (2d) 1094)

[ 1 ]

Before Kelly, Chief Justice, and Bailey, Lusk, Rand, Rossman and Brand, Associate Justices.

*Rex Kimmell,* Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for appellant.

*James C. Dezendorf,* of Portland (Dey, Hampson & Nelson and Frank C. McColloch, all of Portland, on the brief), for respondent.

BAILEY, J.   This suit was instituted by the state of Oregon, acting by and through the state game commission, to enjoin the construction and maintenance by the defendant, Beaver Portland Cement Company, an Oregon corporation, of a hydro-electric project on the Rogue river in Jackson county, Oregon.  From a decree dismissing the suit the plaintiff has appealed.

The hydro-electric project here involved is on the west bank of the Rogue river about three-fourths of a mile north of the city of Gold Hill.  There the river drops over twenty-two feet in a distance of two thousand eight hundred feet, and that location has been used ever since 1882 for the development of water power. From 1913 to 1926 the city of Gold Hill maintained and operated a power plant at that location.

In July, 1926, the defendant was granted a lease by the city to operate the power plant, with an option to purchase it, and in 1936 the city sold and conveyed to the defendant the real property on the west bank of the

river on which the power plant was constructed, together with other lands along that bank, and in addition "all water rights owned by the city of Gold Hill on the sixth day of July, 1926, including, among other things, the following:" adjudicated water right of Oregon Water & Power Company to two hundred twenty cubic feet per second of the waters of Rogue river for the development of seven hundred fifty theoretical horse power; water right obtained by permit from the state engineer February 20, 1917, for one hundred forty-seven cubic feet per second for the development of five hundred theoretical horse power at the point of diversion; water right awarded to the city of Gold Hill on May 26, 1927, for nine hundred eighty cubic feet per second; and the interest of the city of Gold Hill in a water right adjudicated to Neilson and McClure for seventy-five cubic feet per second, with priority as of 1879.

In consideration of this grant the defendant agreed, among other things, to supply, pump and deliver into the water mains of the city of Gold Hill "all water which may be required for domestic and municipal use" and to supply the city, "from the present power plant . . . or from such other source of supply as may be furnished" by the defendant, "such amount of power for municipal lighting purposes as the city" required on July 6, 1926, and any additional power required, at a rate stipulated.

Soon after the defendant leased the plant, it had plans prepared for the reconstruction of the project; and shortly prior to September, 1930, preliminary work in connection therewith was started. However, before any appreciable amount of work had been done by the defendant, a suit was filed in the United States district

court for Oregon by California-Oregon Power Company to restrain the defendant from proceeding with its reconstruction work. California-Oregon Power Company owned the land on the east side of the Rogue river opposite the proposed project, and it asserted that the contemplated reconstruction work would interfere with its riparian rights to the waters of that river. Upon the filing of that suit a temporary injunction was issued, which prevented the defendant's doing any further work until that litigation was concluded.

The decree of the district court therein required the defendant to maintain the level of the water in Rogue river "at the point of diversion at the most northerly end of the wing dam proposed to be constructed" at an elevation of at least 1,070.056 feet above sea level. The decree further provided "that neither the wing dam nor the plant proposed to be constructed, shall be so constructed, maintained or operated as to permit any of the waters of Rogue river to flow from the east channel thereof to the west channel below the above designated point of diversion". This decree was affirmed by the United States circuit court of appeals (73 F. (2d) 555) and by the United States supreme court (295 U. S. 142, 79 L. Ed. 1356, 55 S. Ct. 725).

The nature of the river and the character of the present and proposed reconstruction can best be explained by reference to two drawings, respectively designated as plat II and plat III, taken from the brief of the respondent corporation and herein inserted.

Plat II shows the project as originally constructed and the changes made therein as required by the decree of the federal court and contained in the plans filed by the defendant with the state engineer and by him approved. The old diversion dam, shown on the map by

broken lines, extends from point D at the old headgates to the island in the middle of the river. The southernmost one hundred twenty-five feet of its construction was of concrete, and the remainder of wood. The new diversion dam, which is to replace part of the old dam and to have the same effect as the old in controlling the flow of water, begins at point C, which marks the northerly end of the concrete construction of the old dam, and extends to point B. That part of the new dam apparently was under construction at the time this suit was filed. The trial court found that it was completed before the suit was filed, yet according to the testimony and the respondent corporation's brief, the suit was instituted before the construction was completed.

The letter X near the top of plat II indicates the point of diversion. With the level of the water in Rogue river there maintained at the height decreed, one hundred twenty-five cubic feet of water per second would pass down the east channel of Rogue river, if not permitted to flow into the west channel after passing the point marked X. In order to prevent water from flowing into the west channel, the defendant was required, by the decree of the federal court, to build a diversion dam between points A and B; and such dam, as we understand the briefs and findings of fact, had been completed prior to the institution of this suit.

Plat III shows the canal and the river for some distance southward from the headgates. On it is indicated the proposed power house, with proposed tail race leading from it to the river. Also indicated is the proposed fish ladder from the tail race upward to the canal. At the top of this drawing is shown the division of the river into three channels, designated as A, B and C. The west channel, A, is the largest; and next

PLAT III

in size is the middle channel, B, in which is the largest single fall in the river, at the point designated as X. The channels are here important for the reason that the defendant has submitted plans for improving the natural course of the river by confining the flow of water in a single current through channel A, thereby facilitating passage for fish through water free of the high falls that occur in channels B and C.

The two main runs of migratory fish in Rogue river take place in spring after freshets and in fall after rain. The defendant's contemplated project would not interfere in any way with either of those runs. The water is low in Rogue river in the months of July, August and September usually, although in some years it is low in the early part of November. At such times, when the amount of the entire flow of water immediately above the diversion dam is only one thousand one hundred twenty-five cubic feet of water per second, or less, the volume that goes into the natural channel is only one hundred twenty-five cubic feet per second, as the main body of the current is diverted to the defendant's canal.

There were introduced in evidence United States geological surveys for the year ending September 30, 1910, through the year ending September 30, 1939. From that showing it appears that during many of the years thereby covered the water did not reach the low stage of one thousand one hundred twenty-five cubic feet per second, above mentioned, while during the months of July, August and September, 1931, for example, the flow was not at any time greater than eight hundred eighty-five cubic feet per second. Even during the low stage, however, there is some movement of migrating fish in the river.

The complaint in this suit was filed March 6, 1940. Paragraphs IV and V thereof thus read:

"That the defendant has commenced and threatened to continue the construction of, and will, unless enjoined by order of this court from doing so, build and maintain a dam in the channel of the Rogue river in the vicinity of and adjacent to the above described real property for the purpose of diverting a large portion of the water of said river into its canal and through its proposed hydroelectric plant to be located on such property.

"That such dam, if constructed and maintained according to present plans and specifications, or at all, and the present diversion of water from the channel of the Rogue river which will be effected thereby, will directly interfere with the free passage of migratory fish both up and down the stream of the Rogue river."

On March 13, 1940, the plaintiff's application for a temporary restraining order was heard. At that time evidence was introduced; and on April 3, 1940, the application was denied. In an opinion refusing to grant the temporary restraining order, the court pointed out that: "So far as the particular operation in question is concerned, it seems quite clear that a court having to pass on the question here involved should at an opportune period during the season inspect this particular portion of the river, but it is useless to attempt such an inspection at this time with the high waters now existing, but such inspection will probably be necessary later on in the year to get a more accurate idea of the actual condition and depth of the waters in various portions of the channel."

Thereafter the defendant filed an answer to the complaint, and a trial was had on the merits, beginning

August 13, 1940. On October 7 of that year the court entered an order providing "that either party herein may submit definite plans and specifications for a fish-way around the power house and for improvement of the east channel of the Rogue river opposite the defendant Beaver Portland Cement Company's project on or before thirty days from the date hereof."

In compliance with that provision, the defendant filed with the clerk of the court plans for a fish-way around the power house and for improvement of the east channel of Rogue river. No plans whatever were filed by the plaintiff. On November 28, 1940, the matter came on for further hearing on the plans and specifications submitted by the defendant. And thereafter, on December 3 of the same year, the circuit court entered findings of fact, conclusions of law and a decree. Two of the findings, Nos. 11 and 12, are here quoted:

"Defendant has filed with the state engineer and has introduced in evidence herein plans and specifications for an adequate fish-way around its proposed power house, and for other devices protecting migratory fish from injury in said power house and project, and has offered evidence concerning certain improvements of the natural channel of Rogue river opposite the project which, when completed in accordance with said plans, specifications and testimony, will result in much better conditions for the migration of fish upstream and downstream than would exist under natural conditions.

"The completion by defendant of the proposed hydro-electric project according to the plans and specifications which are on file with the state engineer and in evidence herein, and in accordance with the testimony concerning improvements to the natural channel of Rogue river, will not interfere with the free passage either up or downstream of migratory fish."

The decree is short and, as far as material here, thus reads:

"It is hereby ordered, adjudged and decreed that plaintiffs' complaint be, and the same hereby is, dismissed, without prejudice, however, to the right of the plaintiffs to commence other proceedings to require defendant to construct the proposed devices and improve the natural channel of Rogue river adjacent to defendant's hydro-electric project in *bona fide* compliance with the plans, specifications and testimony introduced herein."

The plaintiff relies principally on § 83-533, O. C. L. A., and § 83-545 (which is also codified as § 116-460, O. C. L. A.), O. C. L. A., for the relief sought in this suit. Section 83-533, *supra*, was enacted as § 13 of chapter 39, Oregon Laws 1921, and reads as follows:

"It shall be unlawful for any person, or persons, firm or corporation, except for securing salmon for propagation purposes, to place any obstructions in Rogue river, which said obstruction will in any way, or at all or in any wise, obstruct or interfere with the progress of salmon going up or down said river."

There is no reference whatever in the title of the act to the subject-matter of the foregoing section. The title of the act mentions the "time, method and areas" in which salmon and other fish are permitted to be taken from the waters of Rogue river and its tributaries, and indicates that the act establishes dead lines, prohibits the taking of trout or salmon "within a three-mile radius outside the Rogue river", defines the word "trout", prohibits the purchase, sale or possession for purposes of sale of any trout taken at any time from the Rogue river or its tributaries, prohibits the transportation for the purpose of sale, barter or exchange, of trout taken from the Rogue river or its tributaries,

prescribes conditions under which fishing may be carried on at Grants Pass, makes it unlawful to take rainbow, steelhead or trout caught in a driftnet, defines driftnet, authorizes the seizure and confiscation of all nets used unlawfully, provides for the forfeiture, disposal or destruction of boats, traps and fishing devices used in violation of the act, confers upon justices of the peace concurrent jurisdiction of offenses described in the act, and prescribes penalties for violation of the act.

■ The provisions of § 13, *supra*, are not within the scope of the title of the act or in any way germane to it. For this reason the section is a nullity, as clearly in violation of § 20 of article IV of the Oregon constitution: *State v. Levy*, 76 Or. 63, 147 P. 919; *State v. Perry*, 77 Or. 453, 151 P. 655; *Peterson v. Lewis*, 78 Or. 641, 654, 154 P. 101; *Korth v. City of Portland*, 123 Or. 180, 190, 261 P. 895, 58 A. L. R. 665.

The other section of the code mentioned, § 83-545, *supra*, is as follows:

"It shall be unlawful for any person, firm or corporation to build any dam or hydraulic structure in the channel of the Rogue river below its intersection with the south line of section 27, township 33 south, range 1 east, W. M., in Jackson county, Oregon, to its confluence with the Pacific ocean, which will interfere with the free passage, either up or down stream, of migratory fish."

This was enacted as § 2 of chapter 287, Oregon Laws 1929. Chapter 287 consists of only two sections, the first of which reads in part thus:

"Subject to such water rights as are existing at the time of the taking effect of this act, the waters flowing in the main channel of the Rogue river from its intersection with the south line of section 27, township 33 south, range 1 east of the Willamette meridian in Jack-

son county, Oregon, to its confluence with the Pacific ocean, hereby are withdrawn from appropriation.''

The section from which the last quoted excerpt was taken also has a proviso to the effect that the act shall not prevent the appropriation and use of ''such water for domestic, stock, irrigation and municipal purposes'', and a further proviso that the act shall not prevent the appropriation and use of waters of any tributary streams.

The power project here involved is below the intersection of Rogue river and the south line of section 27, township 33 south, range 1 east of the Willamette meridian in Jackson county.

In its brief, after stating that ''there was some interference [which, however, was very slight] with the migration of fish at the site of this proposed project put there by nature and existing independent of the construction sought to be enjoined'', the plaintiff goes on to say that: ''Appellant [plaintiff] is willing to concede that before it is entitled to prevail in this cause it must sustain the burden of establishing by a preponderance of evidence that the present proposed construction and the maintenance of it will result in a greater hazard and interference to the fish passing up or down the stream than would otherwise have existed.'' With reference to that statement, the defendant's brief observes, ''It is an obvious fact that there will be some interference.''

In the Rogue river, a few miles below the defendant's proposed project, is the Savage Rapids dam, forty feet in height; and a few miles above the defendant's project is the Gold Ray dam maintained by California-Oregon Power Company. Both those dams extend entirely across the river, and fish pass around

them by means of fish ladders. According to the testimony of the assistant game supervisor of the state game commission, eighty per cent of the fish entering the river from the ocean reach favorable spawning grounds above the Gold Ray dam.

The location of the defendant's proposed project in its entirety is west of the thread of the river. The contemplated construction is in fact a reconstruction of existing works, except the extension of the wing dam built to conform to the decree of the federal court, which extension does not increase the flow of water into the defendant's diversion canal. The new power house is to be built at practically the same site as the old one. It is true that a larger volume of water from the river will flow through the canal to the new power house than to the old, due to the fact that a larger turbine is to be installed. The use of this additional volume of water will, during seasons of low water, reduce the flow in the natural channel of the river, but not at any time to less than one hundred twenty-five cubic feet per second.

The new headgates are not intended to be used at any time to control the flow of water through the canal, except that they may be closed in case of emergency, such as a break in the canal. The flow of water through the canal, and consequently the volume diverted from the river, is controlled by the governor on the turbine at the power plant. The volume diverted affects accordingly the amount of water remaining in the river and flowing through the natural channel.

At the request of the defendant, the trial judge called as an expert witness for the court Ben L. Peterson, a civil engineer employed by the United States engineers, North Pacific division. Mr. Peterson had been in charge of "the fish-way section for

the Bonneville dam''. In that capacity he recommended to the district engineer the plans and specifications for fish ladders in connection with the Bonneville dam and had charge of their construction. His testimony was to the effect that without much expense the flow of the river in channels B and C (plat III) could be diverted to channel A, and by some work on channel A the obstacles encountered by fish in upstream migration could, to a large extent, be eliminated. Mr. Peterson further testified that in his opinion the fish ladder proposed by the defendant would be adequate with fifty, sixty or seventy cubic feet of water per second flowing over it, to accommodate the migration of fish up the river.

■ The plaintiff asserts that the circuit court acted beyond its authority in (1) postponing the further hearing of the case in order to permit the defendant to submit plans and specifications for the improvement of the channel of Rogue river and the construction of a fish ladder, and in (2) calling Mr. Peterson as the court's witness. We are not impressed with this objection. The court was asked by the plaintiff to enjoin the defendant from proceeding with the reconstruction of its power project, on the ground that such reconstruction would interfere with the free passage of migratory fish in Rogue river. At the hearing on the merits, there was testimony concerning the fish ladder to be installed and ''the manner of confining the river flow across the rock reefs to one channel, with various improvements in that channel'', and, in order to afford time for the litigants to submit definite plans and specifications and have a hearing thereon, the court ordered a postponement. This was clearly within the discretionary power of the trial court.

■ The defendant filed an application, supported by an affidavit, requesting that the court call Ben L. Peterson to testify as an expert. The qualifications of Mr. Peterson were set forth in the affidavit, and the further fact that he had declined to testify at the instance of the defendant, "because of the necessity for maintaining friendly relations with the Oregon state game commission and because of a disinclination on his part to assume a position in this case which may appear to be opposed by the state game commission and the witnesses whom it has called". Acting upon this application, the court called Mr. Peterson as a witness. He was questioned both by counsel for the plaintiff and counsel for the defendant.

No argument is made and no authorities are cited by the plaintiff in support of its claim that the court had no authority to call Mr. Peterson as a witness. It is within the sound discretion of the trial court to call, on its own motion or otherwise, expert witnesses who may be able to shed light upon the issues in controversy. In 9 Wigmore on Evidence, Third Edition, § 2484, at page 270, this is said:

"The appointment of disinterested *expert witnesses* by the court is one of the expedients employed for reforming the defects of the partisan system of providing such testimony.

"That the trial court has no power to cause the evidence produced by the parties to be supplemented, never will be conceded, so long as the Bench retains a true conception of its constitutional function and a due sense of self-respect."

See also: *State v. Horne*, 171 N. C. 787, 88 S. E. 433; *Kamahalo v. Coelho*, 24 Haw. 689; and 70 C. J. 566, § 723.

Section 116-415, O. C. L. A., reads in part as follows:

"The use of the water of the lakes and running streams of the state of Oregon for the purpose of developing the mineral resources of the state and to furnish electrical power for all purposes, is declared to be a public and beneficial use and a public necessity, and the right to divert unappropriated waters of any such lakes or streams for such public and beneficial use is hereby granted".

This part of the section has been unchanged since its enactment in 1899 (Laws 1899, page 172).

It is provided by § 116-420, O. C. L. A., that every application for a permit to appropriate water for power purposes "shall give the nature of the works by means of which the power is to be developed, the head and amount of water to be utilized, and the uses to which the power is to be applied." The state engineer is, by § 116-421, O. C. L. A., charged with the duty of passing upon such applications; and if, in his judgment, the proposed use of water "may prejudicially affect the public interest," he is required to refer the application to the state reclamation commission for consideration, and it is made "the duty of said commission to hold a public hearing". In "determining whether such proposed use would impair or be detrimental to the public interest, the state reclamation commission shall have due regard for conserving the highest use of such water for any and all purposes, including irrigation, domestic use, municipal water supply, power development, public recreation and the protection of commercial and game fishing or any other beneficial use to which the water may be applied."

The plans for the defendant's proposed project were filed with the state engineer and were by him

approved, as above stated. In giving his approval, the state engineer must have found that the use of water proposed by the defendant in the manner shown by its plans would not prejudicially affect the public interest.

■ It is true, as pointed out by the plaintiff, that it has always been the public policy of the state of Oregon to protect and conserve migratory fish for the benefit of the people. It has likewise been the public policy of the state, as declared by the legislature in 1899, to permit and encourage the use of waters of lakes and running streams for the development of electric power. Either in respect to migratory fish or power development, the public policy of this state is not to be disregarded.

The trial judge, the Honorable H. D. Norton, now deceased, in his opinion of October 7, 1940, observed:

"I can not concur with the contention of counsel that the law intends to prohibit any obstruction whatever in the stream that will in any wise interfere with the passage of fish, unless it has more substantial results than to cause a little acceleration of piscatorial effort without any attending ultimate prevention of the fish reaching their destination, for, if the fish in their migration up- or downstream can with little more exertion than would otherwise be necessary go around the obstruction, there would be no ultimate loss in the totality of spawning and the reproduction of young fish, and I think such a construction is the most reasonable and logical and is more consistent with the rights of all interests to the use and benefit of the river, if such rights can be exercised without any material diminution of the ultimate amount of spawning that will be produced on the upper spawning grounds."

■ In deciding this case the trial judge was endeavoring to reconcile the enunciated public policy of the state of Oregon in regard to migratory fish with the state's public policy, likewise well established, in regard

to electric power development. The evidence in the case is conflicting as to the effect the proposed power project will have on the passage of migratory fish. After a study of the record before us, our opinion coincides with that of the trial court. When the proposed fish ladder is built and the channel over the rock reefs in the river is improved "in *bona fide* compliance with the plans, specifications and testimony introduced herein," the defendant's reconstructed power project will not interfere to any appreciable extent with the free passage of fish up and down the river.

■ The plaintiff asserts that under the provisions of § 82-426, O. C. L. A., the right to determine the kind, character and sufficiency of fish ladders in streams is conferred upon the state game commission, and that therefore the circuit court was usurping the functions of the commission in determining the adequacy of the proposed fish ladder. It is doubtful whether the section to which the plaintiff refers applies to the dam here in question, which is not built across any stream. Without passing upon that matter, we point out that the circuit court in this suit was asked to grant the plaintiff the extraordinary remedy of injunction, which requires "great caution and deliberation on the part of the court": 28 Am. Jur. 230, § 35; *Ludgate v. Somerville*, 121 Or. 643, 256 P. 1043, 54 A. L. R. 837.

The decree of the circuit court dismissed the plaintiff's suit without prejudice to the plaintiff's right "to commence other proceedings to require the defendant to construct the proposed devices and improve the natural channel of Rogue river in *bona fide* compliance with the plans, specifications and testimony introduced herein"; and this decree is affirmed. Neither party will recover costs in this court.

Petition for rehearing denied June 23, 1942

ON PETITION FOR REHEARING
(126 P. (2d) 1094)

BAILEY, J. In our former opinion we referred to §§ 116-420 and 116-421, O. C. L. A., in relation to the filing of applications for permits to appropriate water for power purposes and to the duty of the state engineer in passing upon such applications. In regard to § 116-421, *supra*, we noted the fact that if, in the judgment of the state engineer, the proposed use of water "may prejudicially affect the public interest," the state engineer is required to refer the application to the state reclamation commission for consideration. The appellant, state game commission, in its petition for rehearing has called our attention to the fact that the provision in § 116-421, *supra*, for referring applications to the state reclamation commission was not included in the statute at the time the applications to appropriate the waters here involved were filed or at the time the permits were granted, and that it was only after the granting of such permits that the state reclamation commission became authorized to pass upon the question of whether proposed uses of water would impair or be detrimental to the public interest.

Sections 116-420 and 116-421, O. C. L. A., were enacted as §§ 46 and 47, respectively, of chapter 216, General Laws of Oregon 1909. Section 46 of that act embraced the same requirement as to what the application to appropriate water for power purposes should contain that is stated in our former opinion to be included in § 116-420, O. C. L. A.

Section 47 of the 1909 enactment required the state engineer to examine all applications for appropriating

water filed with him and to "approve all applications made in proper form which contemplate the application of water to a beneficial use, but when the proposed use conflicts with determined rights, or is a menace to the safety and welfare of the public, the application shall be referred to the board of control for consideration." In the event that an application was referred to the board of control, that board was required, "after full hearing," to enter an order "directing the refusal of such application" if "the public interest demands." Section 47, then codified as § 5723, O. L., was amended in 1923 by § 7 of chapter 283, General Laws of Oregon 1923, by eliminating any reference to the board of control and imposing upon the state engineer the duty of refusing to grant the application if, after full hearing, "the public interest demands".

The provision for referring applications to the state reclamation commission was not incorporated in the law until § 5723, O. L., as amended by § 7, chapter 283, General Laws of Oregon 1923, was further amended by § 1, chapter 245, Oregon Laws 1929. The applications for and permits granted for the appropriation of the waters now claimed by the defendant for power purposes were filed and granted prior to the 1929 amendment and before the state reclamation commission came into existence.

At the time the various applications for appropriating the waters of Rogue river to a beneficial use were made by the predecessors in interest of the defendant corporation, it was the duty of the state engineer to ascertain whether such applications were in proper form, whether they contemplated the appropriation of water to a beneficial use, whether the proposed use of the water conflicted with determined water

rights, and whether the proposed use of such water was a menace to the safety and welfare of the public. Apparently, the law did not at that time impose upon the state engineer the duty of approving or rejecting plans and specifications for the construction of dams.

The revised plans submitted by the defendant corporation for the reconstruction of its power project did not constitute an original application for the appropriation of water. The rights for the entire appropriation had theretofore been granted by the state engineer. Upon the submission of new plans to him, the state engineer undertook to determine whether the proposed reconstruction would change in any way the application of the water to a use different from that set forth in the original applications, whether it would conflict with determined water rights and whether a menace to the safety and welfare of the public would result from the use of water as indicated by the change in plans for construction. A further investigation leads us to the conclusion that the approval by the state engineer of the plans for the proposed reconstruction was limited to those matters and was not a determination by him that such reconstruction would or would not in any way affect "commercial and game fishing".

With this clarification made in regard to the state engineer's approval of the plans, we see no reason for otherwise altering or explaining our former opinion. The other questions raised by the appellant in its petition for rehearing have been given serious consideration both prior to rendering our decision and again on this occasion. As to such questions we are not impelled to depart from our former opinion. The petition for rehearing is therefore denied.