Argued March 20, reversed and remanded July 9, 1957

# STATE OF OREGON *v.* FONG
### 314 P. 2d 243

[ 1 ]

*Irvin Goodman* and *Leo Levenson,* Portland, argued the cause and filed a brief for appellant.

*Howard R. Lonergan,* Deputy District Attorney, Portland, argued the cause for Respondent. With him

on the brief was William M. Langley, District Attorney, Portland.

Before PERRY, Chief Justice, and ROSSMAN, LUSK, BRAND, WARNER and MCALLISTER, Justices.

## LUSK, J.

On January 18, 1955, the grand jury returned an indictment charging that Wey Him Fong, Marjorie Lovell Fong, alias Sherry Fong, and Kowng Ting Yee on the 6th day of January 1954 in Multnomah County, Oregon, "did then and there unlawfully and feloniously, purposely and of deliberate and premeditated malice, kill one Diane Hank by means unknown to the Grand Jury * * *."

The defendant, Sherry Fong (as she is referred to in the record), was granted a separate trial, was convicted of second degree murder, and has appealed.

The defendant's Assignment of Error No. 4 challenges the court's denial of her motion for a directed verdict based upon the alleged insufficiency of the evidence. For the proper consideration of this contention it will be necessary to make a full statement of the evidence.

At the time of the commission of the alleged crime the deceased, Diane Hank, a girl of the age of 16 years, was a close friend and frequent associate of Sherry Fong and her husband, Wey Him (usually called Wayne) Fong. Diane Hank spent the evening and night of Wednesday, January 6, 1954, at the Fong home in Portland, and, according to the state's evidence, was never thereafter seen alive. Her dead body, markedly decomposed, was found on February 26, 1954, wrapped in two blankets and a sheet and

tied up ("trussed up" as the witnesses expressed it) with rope, on a steep hill on the southerly side of the Evergreen Highway in Clark County, Washington. It was the theory of the state that she died as the result of barbiturate poisoning administered by the defendant, that she and her co-defendants were narcotic peddlers and they killed the girl "to silence her as a witness" (to use the language of the state's brief), and to conceal the crime removed the body in the Fong automobile to the place where it was found.

The defendant and Diane became acquainted sometime in 1951 when the defendant employed Diane as a baby sitter for the former's child born out of wedlock. At that time Diane was living at home with her parents in the same neighborhood in Portland as Sherry Fong. Diane enjoyed good health. She was apparently happy notwithstanding that she had given birth to an illegitimate child at the age of 15. In the early part of 1954 she was attending Lincoln High school, and in addition had a part-time job as messenger for a law firm. She had recently taken up skiing, and the evidence indicates that she was intelligent, ambitious and enjoyed life.

The defendant was 23 years of age at the time of the alleged crime. She was married to Wayne Fong in November 1951. She is a white woman, her husband a Chinese. One child was born to this marriage. In 1953 the Fongs moved to a house on Barbur Boulevard in another part of the city from Diane's home and Diane became a frequent visitor there, and at times served as a baby sitter for the two children. She and the defendant exchanged presents, and, as they were about of a size, both being quite tall, they sometimes wore each other's clothes.

For a time after the marriage of Sherry and Wayne

Fong he operated a restaurant in Madras. He sold the restaurant and returned to Portland.

On the afternoon of January 6, 1954, Diane phoned the defendant and asked her if she could bring out a shirt that she had bought for Wayne Fong as a belated Christmas gift, and Sherry invited her to come and stay to dinner. Later in the afternoon Diane phoned her mother and obtained permission from her to accept the invitation. The next day being a school day, she assured her mother that she would be home early. She arrived at the Fong home at about half past six, bringing with her two steaks which Sherry had asked her to buy. Wayne Fong was home when she got there. Before dinner Mr. and Mrs. Gene Smalley, friends of Diane, having learned from the latter's mother that Diane was at the Fongs, dropped in to see her. According to Mrs. Smalley's testimony, Diane drank two Martinis while they were there and was "acting silly." She was wearing a brown jumper and tan sweater, and was in her stocking feet—perhaps was barefooted. The Smalleys left before dinner was served. There is evidence that Diane drank as many as five Martinis during the evening.

Another friend, Ann Incontro, learned from Mrs. Hank that Diane was at the Fongs and phoned her there. She testified that Diane's "words were very blurrish" and that Diane said over the phone that "they were having a party, and that they were going to have dinner, and she said she was high."

About 9:30 in the evening Diane phoned her mother that they had just finished dinner and that the defendant had given her some vitamin capsules, saying that Diane needed them. Mrs. Hank advised her to give them back, and Diane said that she would, though she added, "You know, it would be kind of hard; you

know how Sherry is." Diane phoned her mother again after ten o'clock, and said that her hair was up in pin curls and that she would be home soon. Finally, at about eleven o'clock Diane again phoned her mother to tell her that Mr. Fong, who had left, had not returned so that Mr. Fong could not bring her home, and Mrs. Hank suggested that, in view of the lateness of the hour, she should stay the night.

The defendant testified that the capsules she gave Diane were Rubramin, which is Vitamin $B_{12}$, and Theragran M, which is also a vitamin, and that she put them in a little bottle and typed on a label, which she affixed to the bottle, the words "Diane: take one daily." There is no claim that these vitamins are poisonous. About 10 minutes after eight o'clock on the morning of January 7 Mrs. Hank phoned the Fong residence and was told by the defendant, in answer to her inquiry as to why Diane had not called her, that Diane had taken the bus at about eight o'clock. The defendant testified that she and Diane went to bed about 11:30 p.m., that they occupied different rooms on the second floor of the house, and that before going to bed Diane had left her shoes in the defendant's room; that they slept late, and on arising she got Diane's shoes for her, and Diane refused her offer to drive her to school and said that she would take the bus; that the defendant consulted a bus schedule which she kept in the house and ascertained that there was a bus leaving at either three minutes to or three minutes after eight o'clock; that Diane refused her offer of fruit juice or coffee, went into the children's room to kiss her daughter Catherine goodbye, said that she would use the bathroom downstairs, and walked downstairs to the first floor, and that was the last time the defendant saw her alive.

The defendant was questioned on cross-examina-

tion about her co-defendant, Kowng Ting Yee. She testified that he slept there and was gone most of the time; that he was there on the morning of January 7, but she did not know what time either he or her husband came home that night; that it was their habit to return home around one-thirty or two o'clock in the morning.

When the dead body of Diane Hank was discovered it was clothed in a brown jumper, a tan cashmere sweater, a nylon slip, a brassiere, a pair of panties, and a panty girdle beneath the panties. They were the identical clothes she wore when she went to the Fong home on the evening of January 6, 1954. There were "some bobby pins in the hair, and the hair was up in curls, that is, curled to produce curls." There were neither shoes nor stockings. Dr. Homer H. Harris, former director of the crime laboratory of the Oregon Medical School, who examined the body and afterwards performed an autopsy, testified that from the way the panty girdle was arranged it appeared that the person probably placed the garment on herself. The brassiere, however, was not in normal position; it was partially unfastened and slipped up over the breasts.

In a pocket of the jumper there was found a small plastic bottle about two-thirds full of capsules which were identified as Rubramin and Theragran M. Sometime in the course of the investigation of the case this bottle was lost, and secondary evidence respecing it was received. It bore a label of Riggs Pharmacy from which the defendant had purchased vitamins, and the following typewritten words: "Rubramin" and (on a line below) "Diane: take one daily." A copy of the typewriting was made by an investigator for the district attorney on the typewriter used by Riggs Pharmacy; and another copy on the defendant's typewriter,

which was seized under a search warrant. According to the testimony of Stanley MacDonald, superintendent of identification in the Multnomah County sheriff's office and an acknowledged expert, who had examined the label on the lost bottle, the word "Rubramin" was written in green ink on a machine having American elite type, while the words "Diane: take one daily" were written in black ink on a machine having pica type. The Riggs Pharmacy machine had American elite type. The type on the defendant's machine was German elite. In Mr. MacDonald's opinion the words "Diane: take one daily" could not have been written on the Riggs Pharmacy machine, and none of the words could have been written on the defendant's machine. As the typing on the lost label disclosed a defect in the letter "i" in the word Rubramin, and the identical defect was found in the American elite type of the Riggs Pharmacy machine, the conclusion is warranted that the word "Rubramin" on the lost label was written on the Riggs Pharmacy machine, and this the state concedes. A pharmacist employed by Riggs Pharmacy testified that their practice was to put Rubramin capsules in a plastic vial, type the word Rubramin on a label, and insert the label inside the bottle.

Dr. Harris testified that on the inner surface of the blankets he found black hair, straight and coarse, which was determined under microscopic examination to be of the Mongoloid type, most commonly found on subjects of the yellow or red race. It could not have come from the head of the deceased, and was similar to samples of hair taken from the heads of the co-defendants, Wayne Fong and Kowng Ting Yee.

Dr. Harris further testified that on the outer blanket over the region of the knees, on the seat of the panties, and the back of the slip next the hem on the

inside he found a deposit of black sooty material. In the basement of the Fong home he found similar material. There was expert testimony that the sooty material taken from the Fong basement and that detected on the dead girl's garments were both briquet dust, and the theory advanced by the state is that this dust was picked up when the body of the dead girl was dragged across the basement floor of the Fong home. It is shown without dispute, however, that the house was heated with an oil furnace, and the defendant testified that there were never any briquets in the house other than charcoal briquets.

A spot on the floor mat of the trunk of the Fong automobile was identified as blood by Dr. Harris, but he was unable to determine whether or not it was human blood. On January 11, 1954, the defendant had her car, including the trunk, washed.

Pio Reigo, a Filipino who at one time was employed by Wayne Fong, swore that the latter, in January 1954, talked to him about a dead body; told him the body was in the car, and "he tell me to come help him." Later Fong told him to keep his mouth shut and threatened to kill him if he did not.

The mother of Diane Hank saw the defendant at the latter's home on January 14, and on that occasion the defendant delivered to Mrs. Hank Diane's scarf or bandana which she had worn as a head covering on January 6, and told Mrs. Hank that on that evening Diane had torn a pair of stockings and the defendant had given her a pair of her own. The evidence is that it was raining at about eight o'clock on the morning of January 7. If the defendant's story is to be accepted, then the girl left the defendant's house that morning in the rain without either head covering or umbrella.

Medical evidence respecting the cause of death was

given by Dr. Homer H. Harris; Dr. Joseph Beeman, director of the Oregon State Police Laboratory from 1936 to 1947 and since 1948 a practicing physician in Boise, Idaho; Dr. Frank Menne, organizer of the Oregon Crime Laboratory; and Dr. Norman A. David, pharmacologist, that is, one versed in the science which deals with drugs including their toxic effects. As stated, Dr. Harris performed the autopsy, and continued his investigation over a period of more than a year after the discovery of the body of the dead girl. He testified that barbital is a poison, and there is no evidence to the contrary. After making a number of tests he found that approximately one-half milligram of barbital was present in 100 grams of liver, and that the amount was approximately the same in the other organs and in the stomach contents. To him this was evidence that the barbital had been absorbed out of the stomach and the intestines and was equilibrated fairly well throughout the body. In other words, it had been in the living body long enough to be well distributed. He expressed the opinion that it is possible for a person to have a relatively high concentration of barbital in the body at one time sufficient to do irreparable damage and to live for a number of hours or days, long enough for the material to be destroyed or excreted by the body, and for such person finally to die from the injury and subsequent pneumonia which may develop. After repeated microscopic examinations Dr. Harris found in March 1955, as he testified, a minimal amount of pneumonia and a small amount of edema, that is, fluid in the air sacs, which frequently accompanies a pneumonia. Edema occasionally contains within it some of the fluid in the body, and the fluid, which may contain blood, may run out of the mouth and nose after death, and frequently does if the body is

moved and pressure placed upon the chest. He found no vomitus in the lung section and was of the opinion that the girl lived at least six or eight hours from the time that she had received the barbital. He found no other evidence of injury, disease or poison. On the basis of these findings and other facts in evidence concerning the health of Diane Hank, the known events of the evening of January 6, 1954, including the fact that Diane may have drunk as many as five martinis during the course of the evening; and the fact that, according to Dr. Harris' opinion, the body when found had been dead at least 30 days and possibly two and one-half months, he concluded that the girl's death was due to barbitals or the combined action of alcohol and barbitals. He explained that alcohol and barbitals are both classified as depressant substances; that is, they both act to depress the brain, and, if the two are taken together, they have what is called "synergistic action," that is, "they tend to work together and produce more depression than either one could produce acting alone."

It was testified that a barbiturate has a bitter taste, but that in the presence of alcohol the bitterness would be definitely disguised.

The other medical witnesses for the state corroborated the evidence of Dr. Harris. We mention especially the testimony of Dr. Beeman as he examined and tested some of the tissue taken from the body of Diane Hank by Dr. Harris. He explained that barbiturates are a synthetic chemical, and there are various kinds according as different chemicals are used. They are all sleeping tablets. Some of them, as, for example, nembutal, seconal and amytal, act quickly, and an overdose may cause death. In many cases of a fatal dose very little barbiturate is left in the body at the time of death because "When the drug has been

taken in the body, it is absorbed from the stomach and from the small intestine, and while it is building up a concentration, it is also being either excreted or being passed out through the urine, or it is being burned up by the tissues of the body." Dr. Beeman identified, and there was received in evidence, a small bottle which he testified contained residue extracted from the tissues of Diane Hank. He said that these materials were short-acting barbiturates, either seconal or nembutal. He found 4.10 miligrams of the barbiturate in the specimen which he examined, this being approximately 1 miligram per 100 grams of tissue. For reasons previously stated, this small amount of barbiturate "doesn't mean that it is all of the barbiturate that the patient originally got."

Since we are dealing with the question whether the evidence was sufficient to take the case to the jury it is unnecessary to state the medical evidence on behalf of the defendant in any detail. In the main, that evidence took issue with the state's medical witnesses as to the reliability of the tests used by Dr. Harris and Dr. Beeman, or, more accurately, the tests which the defendant's witnesses thought they had used, for the purpose of detecting barbiturates in decomposed tissue. Dr. William Lehman, a pathologist, expressed the following opinion:

"With the evidence presented in the autopsy and with the evidence obtained on toxicological examination, there is no proof that she died of barbital poisoning. She could not have died with those evidences from that material."

There was no direct evidence that the defendant possessed any barbiturates at or about the time of the alleged crime. Since September 1953 she had been

a "pre-med" student at Portland State College. She was employed by a physician whose office was in the same building as the Riggs Pharmacy, was known to the people in the pharmacy, and was able to get certain vitamins there without a prescription for which a prescription was ordinarly required. The defendant testified that the physician who employed her had given her some barbiturates in 1951 or 1952, but that there were none in her house in January 1954. A former housekeeper for the defendant testified that sometime in 1953 the defendant had given her phenobarbital when she complained of a headache and sleeplessness, and that the drug relaxed her and she went to sleep. The witness, Robert Wayne Richards, testified that in May 1954 the defendant told him that Diane committed suicide with barbiturates which defendant kept in her house. In the same month she told Captain William D. Browne, of the Portland police, according to the latter's testimony, that Diane had taken barbiturates and had "contributed perhaps seventy-five per cent to her own death," and that barbiturates were all over the house.

On January 20, 1954, the defendant made herself acquainted with a married couple at a bar, had several drinks and dinner with them, and, during the course of the evening, told them, according to their testimony, that her life was "so fantastic, I even found a body in my basement," or she may have said "there was a body in the basement," and she told her auditors, when they asked for an explanation, "Oh, you will read it in the newspapers. It will all be in the newspapers."

The defendant caused to be published in The Oregonian of January 26, 1954, an advertisement reading as follows: "DIANE—Please contact me. Regardless

of your present circumstances or anything you may have done, I'll help you all I can. Sherry."

On February 27, 1954, the day before the discovery of the body of Diane Hank, the defendant told a companion that she was afraid she would be arrested for murder.

As stated at the outset, it is the theory of the prosecution that the defendant murdered the deceased "to silence her as a witness," by which we understand is meant that the defendant feared that Diane Hank would disclose to the police whatever information she may have had about the Fongs' illegal trafficking in narcotics, and to prevent this they decided to put her away. We will now state the evidence relating to that subject, together with other evidence of statements of an incriminatory character made by the defendant, not all of which, however, bear upon the alleged motive.

Several girl friends of Diane's testified to statements made by her concerning the illegal activities of the Fongs as follows: that she had gotten marijuana in the Fong's home and that they had imported "dope"; that there were narcotics in the Fong home; that Wayne Fong had a gambling establishment and she thought he was involved in narcotics or a dope ring of some sort; that Sherry smoked marijuana.

The witness Richards, a bartender and ex-pugilist, was employed by the Portland city police in March 1954 as an undercover man in the investigation of this case. The defendant frequented a restaurant in Portland called Davey's Locker, where Richards worked. Richards made her acquaintance and gained her confidence, which, judging from this and other incidents disclosed by the record, was not a very difficult thing to do. According to Richards, the defendant told him that she and her husband were head importers of

narcotics for the entire Northwest, that she was actually the head, and "Diane Hank was talking too much, particularly among the other high school students," about "their narcotic activities, and the syndicate had wanted to get rid of her, and because of her association with Diane, she had wanted to save her, and she had offered to pay as high as $125,000 to get the syndicate off of her neck." On another occasion, Richards testified, the defendant told him that "Diane had been running around with her husband and had been smoking some pod with him, known as tea or marijuana; and she caught them out in a Chinese restaurant one time, and she told her that if she ever caught her out with him again, she would kill her." On cross-examination Richards testified that the defendant made the statement about $125,000 "after she had told me that she killed Diane, but let the police prove it." She also told Richards, according to his testimony, that Diane had committed suicide because "she was jealous of the men in love with Sherry Fong and her money and power," and that Diane had left a suicide note; that "she hated cops, and she wanted to be a puzzle to the cops and didn't want to die an ordinary death; she wanted to be a sensation" (it is not entirely clear whether "she" in the foregoing clause refers to Diane or the defendant); that she put the body in the basement "in order to tie up the cops and make a serious case"; that she knew something about the body which only the people who put it there would know, namely, that "the bra was up off the breast"; that she wrapped the body in blankets and had two people help her put the body in the car and took it over to Washington in the car; that she got blood on her hands from Diane's mouth when she moved the body.

Some 66 pages of the transcript of testimony are

devoted to evidence, all received over objection of the defendant, relating to the alleged narcotics ring. This evidence goes back in time to October 1947 when Wayne Fong, then in the Army, was arrested for possession of smoking opium and released to the Army for court martial on a narcotics charge and for desertion. It shows that Wayne Fong was convicted on a narcotics charge in 1948. It brings in the following named persons: Kowng Ting Yee; Wei Ching Lee, alias Little Joe; Lee Yee Guy, alias Harry Lee; Marian Forest, alias Honey Latourell; Jimmy Valentine; Lee Yuen Hai, alias Eddie Lee; and Harry Korf. As previously stated, Kowng Ting Yee slept in the Fong home, and, according to Richards' testimony, the defendant told him that Yee was a "leg man" for Wayne Fong and he ran around with Little Joe. Richards also testified that the defendant told him that Jimmy Valentine and Honey Latourell came to the Fong home in May 1954 and that Wayne Fong gave Valentine a package and received a large sum of money.

The substance of additional testimony given by law enforcement officers concerning these individuals follows: Jimmy Valentine, Honey Latourell, Harry Lee and Korf are narcotic addicts. Harry Lee was arrested in July 1949 for possession of opium, and Wayne Fong came to see him in the United States marshall's office. In 1952 a state policeman, making a narcotics investigation at Madras, knew or saw in Lee's cafe at various times the defendant, Wayne Fong, Little Joe and Harry Lee. The last named worked in the restaurant as cook. Eddie Lee was arrested in August 1952, and at the time of the trial was a prisoner in McNeil Island penitentiary for the possession of opium. On several occasions an officer observed suspicious conduct on the part of Eddie Lee and Wayne

Fong, acting together. Wayne Fong was under police surveillance one night in 1952, and his conduct, along with that of Little Joe, was described to the jury. Little Joe was arrested in February 1953 for the sale and possession of heroin. Wayne Fong was seen in an automobile with Jimmy Valentine in January 1954. On one occasion Wayne Fong paid Little Joe's attorney's fee, apparently, though it does not clearly appear, for services in a criminal case. In early January 1955 the police raided Fong's Club, apparently a gambling establishment, and Harry Lee was in the club dealing cards. In July 1955 Harry Korf, who had been investigated by the police a number of times as far back as 1949, was arrested and nembutal found on his person. He was driving a car registered to Wayne Fong which the police took into custody. Jimmy Valentine tried to obtain release of the car, saying that he had allowed Korf to drive it. Honey Latourell was arrested in May 1954 and Korf was in her apartment at the time.

In some instances, details of the arrests and the transactions leading up to them were related by the witnesses, much as though the trial was a prosecution for conspiracy to violate the Harrison Anti-Narcotics Law. A graphic description of Honey Latourell administering a "shot in the arm" to Jimmy Valentine in the year 1950 was permitted to be given. A witness was permitted to describe at length and in detail the revolting "withdrawal symptoms," as they are termed, of a narcotic addict manifested by Honey Latourell when she was in the Portland city jail in 1953. Photographs of all the persons named were received in evidence, all of them except Wayne Fong's having been taken in prison and bearing prisoners' numbers. These photographs, except those of Wayne Fong and Kowng

Ting Yee, were stricken from the record in the court's charge; but, as they were received in evidence at the beginning of the trial three weeks earlier, it is doubtful whether anything the court said about them at that time could erase the impression they must have made on the jury.

■ Nine different grounds are specified in the motion for a directed verdict and are repeated in the brief. Some of these, such, for example, as alleged misconduct of the prosecuting attorney, are irrelevant to the question arising upon such a motion. The remainder are summed up in the claim that the state failed to prove the corpus delicti and the defendant's connection with the alleged crime. In this case proof of the corpus delicti means proof that Diane Hank was dead and that her death resulted, not from accident or natural causes, but from a criminal agency other than suicide. *State v. Henderson,* 182 Or 147, 190, 184 P2d 392, 186 P2d 519.

■ In our opinion, the fact that the dead body of Diane Hank was found wrapped in blankets, tied up with rope, on a lonely hillside in the state of Washington; the evidence that she died of poison; and the circumstances such as her high spirits and apparent zest for life, which repel an inference of suicide, constitute the basis for a finding by the jury that the girl's death was brought about by the criminal act of someone. *Paulson v. State,* 118 Wis 89, 95-96, 94 NW 771; *Lancaster v. The State,* 91 Tenn 267, 18 SW 777; *Commonwealth v. Homeyer,* 373 Pa 150, 156, 94 A2d 743.

■ We are satisfied also that the evidence presents a question for the jury as to the defendant's connection with the alleged crime. Since, for reasons presently to be given, the judgment must be reversed and a new trial awarded, we do not wish to be understood as ex-

pressing an opinion concerning the weight of the evidence or the strength or weakness of the state's case. It is unnecessary to indulge in elaborate reasoning in support of our conclusion. The evidence speaks for itself. From it the jury could have found that the defendant had poison in the form of barbiturates in her possession on the night of January 6, 1954; that Diane Hank died in the defendant's house on that night of barbiturate poisoning; that the defendant concealed the fact from the mother of the girl and disposed of the body in the manner already described. Numerous circumstances tend to corroborate the defendant's own declarations out of court that she disposed of the body. There is no claim of accident; the defense is simply that there was no such occurrence. Of course, if the girl had died in the defendant's house as the result of an overdose of barbiturates mistakenly administered to her instead of vitamins, or if she had died of natural causes, "there would have been no motive on the part of anybody to prevent an immediate knowledge of the fact, or to conceal the body." Charge of Chief Justice Shaw to the jury in *Commonwealth v. Webster,* 5 Cush (59 Mass) 295 (see the Bemis report of that case at p 485). And "all attempts on the part of the accused to suppress evidence, to suggest false and deceptive explanations, * * * tend somewhat to prove consciousness of guilt, and, when proved, to exert an influence against the accused." *Commonwealth v. Webster,* supra, 59 Mass at 316. See *State v. Hansen,* 195 Or 169, 201, 244 P2d 990; *State v. Clark,* 99 Or 629, 645, 196 P 360; *State v. Zullig,* 97 Or 427, 431, 190 P 580; *State v. Williams,* 46 Or 287, 291, 80 P 642; *Wills on Circumstantial Evidence* (6th ed) 351. So, likewise, the jury could have found that the advertisement the defendant caused to be published in The Ore-

gonian was a ruse intended to avert suspicion, and hence a further manifestation of a sense of guilt. Wills, op cit, 136.

■ The argument on behalf of the defendant is directed first to a discussion of the weight of the evidence and conflicts between the evidence for the state and that for the defendant, matters which we are not permitted to consider. Art. VII, § 3, Constitution of Oregon. It is said next that " 'proof of crime by admission alone, however obtained' is not admissible," citing *State v. McPhee,* (Me) 115 A2d 498. With this we agree, but in this case there was much more than admissions. There are proof of death by poisoning, of possession of the poison by the accused, of opportunity to administer it, of concealment, deceit, and other conduct indicating a sense of guilt. And it is to be remembered that statements of extraneous facts by the accused may afford some proof of the corpus delicti because such evidence tends to show the criminal agency of the defendant. *State v. Weston,* 102 Or 102, 115, 201 P 1083. See, also, *State v. William Lester Schleigh,* 210 Or 155, 310 P2d 341, 346. Counsel for the defendant say further "The case at bar is predicated on inference upon inference and not upon fact." We are not told in what respect this is so. There is an abundance of proven facts and inferences which may be drawn from them supporting the charge in the indictment, or, as Mr. Justice McBride said in *State v. Clark,* supra, 99 Or at 666 (a case like this depending entirely on circumstantial evidence) "a series of independent inferences from a series of independent facts." And it is worthwhile to repeat the statement from the opinion in the Clark case, where the same claim was made that the defendant makes here:

"* * * One fact may give rise to a single in-

ference, or it may give rise to several inferences, or a logical conclusion may be drawn from a multitude of detached circumstances so related to each other and to the fact to be proved that it would be illogical to assume that they could all exist coincidentally and the fact in dispute be nonexistent."

The evidence is not speculative but presented a question for the determination of the jury, and there was no error in the denial of the motion for a directed verdict.

■ In our discussion of the motion for a directed verdict we have omitted all reference to the evidence regarding the alleged narcotic dealings of the defendant and others and its bearing on the question of the motive for the crime. Admission of this evidence was repeatedly objected to and is assigned as error. The assignment does not include the declarations of the defendant to Richards concerning the "syndicate" which imported opium and its desire to get rid of Diane Hank. We think that this constituted some evidence—the weight and effect of which was for the jury—of the motive. The defendant's statement to Richards that the syndicate desired Diane's death because she was talking too much, and that she, the defendant, wanted to save her may readily be inferred, as the court said in *State v. Epes,* 209 SC 246, 261, 39 SE2d 769, to have been "deliberately designed as self-serving and self-exculpatory" for, while it denied guilt, "the trial judge and the jury were justified in drawing an inference of guilt" from it. The evidence of Diane's statements to her friends about the narcotic dealings of the defendant and Wayne Fong was objected to as hearsay and its admission is assigned as error, but the ruling was correct under an exception to the hearsay rule, not to prove that the defendant and her

husband dealt in narcotics, but to show the state of mind of the deceased and her knowledge of these alleged illegal activities. 2 Wigmore on Evidence (3d ed), §§ 265, 266; 20 Am Jur 491, Evidence § 585; *Commonwealth v. Trefethen,* 157 Mass 180, 188, 31 NE 961, 24 LRA 235; *Bridges v. State,* 247 Wis 350, 364, 19 NW2d 529, 19 NW2d 862; cf *People v. Hines,* 284 NY 93, 109-110, 29 NE2d 483.

But the lengths to which the state was permitted to go in the introduction of evidence relating to the alleged narcotic ring is quite another matter. The argument most pressed upon us by counsel for the defendant is that this evidence served no other purpose than to prejudice the minds of the jury against the defendant, that it amounted to an attack on her character when her character was not in issue. The state answers, that, as the existence of the ring was an essential fact in connection with the motive, it was properly allowed to go fully into that subject.

■ The rule is well established and not questioned that evidence of other crimes committed by the defendant is not admissible unless it is relevant upon some issue in the case. *State v. Reyes,* 209 Or 595, 308 P2d 182; *State v. Jensen,* 209 Or 239, 296 P2d 618; *State v. Long,* 195 Or 81, 112-119, 244 P2d 1033. The reason for the rule, as we said in the Jensen case, is "that it tends to present the defendant to the jury as a bad man generally and to prejudice their minds against the accused, and to predispose them to belief in his guilt." But, where such evidence tends to show the motive for the commission of the crime for which the accused is on trial it is properly admitted. Thus, in the Reyes case the state was permitted to show that just prior to the shooting to death of a citizen who was aiding the police

to capture the defendant, the latter had committed a number of felonies and was attempting to escape arrest.

In the consideration of this question it must be constantly kept in mind that it is the defendant, Sherry Fong, who was on trial, not her husband, Wayne Fong, nor any of the rest of the motley assortment of characters whose misdeeds and crimes were paraded before the jury. In no conceivable aspect of the case could Wayne Fong's violation of anti-narcotic laws in 1947 and 1948, more than four years before the defendant knew him, be held to be relevant or material. Equally plain is it that the evidence of the police raid of Fong's Club in January 1955 and the arrest of Harry Korf in July 1955 for possession of nembutal, both a year or more after the death of Diane Hank, could throw no light on the charge of murder against Sherry Fong. Consider the evidence about Honey Latourell's withdrawal symptoms and Jimmy Valentine's submission to an injection of morphine by Honey Latourell (the latter in 1950). What possible effect could it have other than to create an atmosphere of hostility to the defendant and prevent a fair consideration of the charge against her?

The state argues that extensive proof of motive was permissible, and cites numerous cases to the following proposition quoted from *Miller v. State,* 130 Ala 1, 16, 30 So 379: "The existence of this motive depends upon the inquiry whether the defendants committed the other offenses, and of course proof that they did commit them must needs involve evidence as to the particulars of those offenses, evidence of the several acts which enter into and constitute them." This is a correct statement of the law, and it has been many times applied by this court, most recently in *State v. Reyes,* supra. We have read all the cases cited by the state on

this point, and are of the opinion that none of them are authority for the admission of the evidence now under discussion.

■ There is no evidence that the defendant committed or had any connection with any of the offenses of third persons to which the witnesses testified. She certainly had nothing to do with Wayne Fong's law violations in 1947 and 1948, or Harry Lee's arrest for possession of prepared smoking opium in 1949, or with Wayne Fong's visit to Harry Lee at that time while he was in custody. What of the others? Eddie Lee was arrested in August 1952. So far as the record shows the defendant did not know him. A police officer saw Eddie Lee and Wayne Fong on a street corner engaged in conversation about a year later. Jack M. Merrill, federal narcotics agent, testified that on four or five occasions (he did not say when) he had seen Eddie Lee in a restaurant and approximately two or three minutes later saw Wayne Fong enter the restaurant. The witness said "that is as close as I could put the two together," and that is as close as the evidence comes to connecting Eddie Lee's law violation with the defendant. The evidence does not disclose when Wayne Fong paid the attorney's fee for Wei Ching Lee (Little Joe) nor the nature of the case in which the services were rendered. Little Joe was "at the restaurant" in Madras, and the defendant may have known him. The remaining testimony with reference to him came from a policeman who said that he and his partner had Wayne Fong under surveillance one night in the early winter of 1952 and saw him double park his car in front of the Broadway Hotel. They knew that Little Joe was living in the hotel. Wayne Fong got out of the driver's side of the car, entered the hotel, was there about a minute, came out and got into the car on the driver's

side. In a short while Little Joe came from the hotel and walked up to the car, and, as he did so, a passenger in the car got out and went with Little Joe back into the hotel. The passenger returned soon, got into the car, and they drove off. The witness never learned who the passenger was.

Just what the relevancy of the evidence last recited is supposed to be we are unable to say. It may, of course, along with the other evidence on this subject, excite suspicion and lead to speculation as to whether Wayne Fong or "the syndicate" (whoever they may have been) was master-minding the narcotic transactions that were proved. But there is nothing substantial to justify such a finding, and it is not permitted to indulge in conjecture when life or liberty is at stake. In our opinion, when the prosecution claims that the motive for homicide is to silence the victim as a witness to crime, the admission of evidence of crimes committed by third parties for which the accused is not shown to be responsible or even to have any knowledge of, is prejudicial error and ground for reversal.

■ Motive is never a necessary element of proof (*State v. Humphrey,* 63 Or 540, 550, 128 P 824), though it is frequently a very important element when the prosecution is compelled to rely entirely on circumstantial evidence. And the motive for murder may be comparatively trivial (*State v. Hansen,* supra, 195 Or at 195). But in this case one looks in vain for the possession of information by Diane Hank concerning the alleged narcotic activities of Wayne Fong, Little Joe and the rest, which the police did not already have. These people were suspect in the eyes of the police, and they, no doubt, were aware of that fact. The defendant's own admissions, as we have said, were sufficient to make the existence of the motive claimed a

jury question; but the state exceeded the bounds of legitimate proof when it attempted to build up the element of motive by collateral evidence, the effect of which could only have been to represent the defendant as a degraded woman not entitled to the presumption of innocence which, under our law, clothes every person accused of crime.

The transcript of testimony in this case comprises 1476 pages and 184 exhibits were introduced. The trial commenced November 15, 1955, and was concluded on December 6, nearly three weeks later. It was a bitterly contested case in which a great deal of time was wasted in heated exchanges between the court and the prosecuting attorney and lengthy explanations by the court of its rulings. The record is replete with charges of misconduct against the prosecutor and motions for a mistrial made by defense counsel, and much of the defendant's brief is devoted to this subject. While what we have already said is enough to dispose of the appeal, nevertheless we deem it our duty to notice an assignment of error based on alleged misconduct of the prosecuting attorney. We do not wish to seem by silence to minimize the gravity of the incident and the rulings of the court which precipitated it.

Two witnesses were called by the defense to prove that Diane Hank was alive after January 6, 1954. They were young ladies who were in high school at the same time as the deceased. One of them, Carol Thompson, had never spoken to Diane Hank; the other, Sally Joann Irwin, was slightly acquainted with her. Carol Thompson testified that she saw Diane Hank on January 7, 1954, between 5 and 5:30 p.m. at Sixth and Yamhill streets in Portland as she was crossing the street. She said they did not catch each other's glance as Diane was looking in the opposite direction. Sally

Joann Irwin testified that she saw Diane in Meier & Frank's department store on January 26, 1954, and that they said "Hi" to each other. The testimony of both witnesses was materially weakened on cross-examination.

The court, to use the court's words, "made its own investigation" and called and examined the five witnesses hereinafter named "in behalf of the court." Claudia Lee Dudley and Joyce Louise Larvik testified that Sally Joann Irwin had told them that she had seen Diane Hank in Meier & Frank's store. Howard Terrell Lowery and William Howard Beavert testified that Miss Irwin was not unstable and was a person who would not give sensational testimony for the sake of notoriety. Lois Findlay Grierson gave testimony of the same tenor with reference to Miss Thompson. The prosecutor objected to this evidence and the court threatened to hold him in contempt.

At the conclusion of the cross-examination of Miss Thompson the court interrupted and had her identify two written statements which she had given to the district attorney, and the production of which had been called for by the court. Both were dated March 11, 1955, and related to her claim that she saw Diane Hank on January 7, 1954. The court caused these statements to be introduced in evidence over the objection of the state that they were "hearsay of a double-distilled sort," which they were. The court then charged the district attorney's office with suppressing evidence, and the prosecutor countered with the following:

"MR. LONERGAN: Good, I have another one. Here is another one, a confession of Sherry Fong to this witness, substantiated by money paid by Sherry Fong. Put that in evidence, too, as long as you are talking about suppressing evidence. We

> don't bring anyone up here that isn't substantiated fully. These witnesses have not been substantiated fully."

The words, "another one," refer to an unsworn statement written out in ink and signed "Mrs. Eleanor Lamphier." It purported to recite incriminating statements regarding the death of Diane Hank made by the defendant to Mrs. Lamphier when they were both prisoners in Rocky Butte jail. The prosecutor exhibited the statement in front of the jury and called upon the court to introduce it in evidence. This the court refused to do. The statement was, however, "impounded" by the court and sent to this court by the judge with a personal letter to the clerk as a part of the record.

The incident culminated in the court holding Mr. Lonergan in contempt, but deferring the imposition of punishment.

Whether it is ever proper for the court in a criminal case to make its own investigation and call its own witnesses, we need not now determine. It is assuredly most unusual, if not unprecedented, under the judicial system of this state. Substantial support has been found for the proposal that in a civil case, on questions which call for the opinions of experts, the court should be permitted to call its own witnesses because of what is said to be the tendency of expert witnesses to shape their opinions to suit the purposes of the party who calls them. See American Law Institute, Model Code of Evidence, Rule 403. Such witnesses have been referred to as "expert advocates." Idem, p. 34. In one case, a suit in equity, this court held that "it is within the sound discretion of the trial court to call, on its own motion or otherwise, expert witnesses who may be able to shed light on the controversy." *State v. Beaver Portland Cement Co.*, 169 Or 1, 17, 124 P2d 524, 126

P2d 1094, citing 9 Wigmore on Evidence, 3d Ed. Sec. 2484, at p. 270. But we have yet to hear it suggested that a judge presiding over a criminal trial with a jury has, or should have, the authority to call witnesses of his own on an ordinary fact issue; least of all, that he may take sides by calling witnesses to bolster the testimony on behalf of one of the parties. If he can do this to help out the defendant we see no reason why he cannot do the same thing to assist the state.

Apart from this, it is certain that a circuit judge is bound by the rules of evidence equally with the litigants, and this court cannot sanction the introduction of evidence intended to show that a witness whose character has not been impeached is worthy of belief (ORS 45.620), nor of hearsay evidence that a witness has said the same thing out of court to which he testifies on the trial, even though it be the trial judge at whose instance such evidence is introduced.

Furthermore, the court was wrong in introducing in evidence the extra-judicial statement of the witness Carol Thompson, and was not justified in charging the district attorney's office with the suppression of evidence. A prosecutor is under no duty to call as a witness everyone who claims to have knowledge of the facts of a criminal case. He is entitled to use a sound judgment as to whether such persons are telling the truth or really have seen or heard what they honestly think they have seen or heard. No better illustration can be given than the Webster case to which we have heretofore referred. That also was a case where the victim of an alleged murder disappeared and a number of witnesses for the defense testified to having seen him after the time, when according to the Commonwealth's evidence, he was killed, his body dismembered and concealed. Chief Justice Shaw took occasion to caution the

jury about this kind of evidence. Among other things he said:

> "In the first place, there is the uncertainty, when the observation was hasty and casual, whether, without supposing any intention to mislead, the witness was not mistaken in the person. The other is, that the whole efficiency of the proof depends upon the accuracy of the witness as to the time and place at which the person was seen." Bemis Report, p 478.

In this case the observations of Sally Joann Irwin and Carol Thompson were hasty and casual and the witnesses could easily have been mistaken as to the time. The district attorney makes no claim that they testified falsely; but merely that they were mistaken.

The case of *State v. Barrett,* 33 Or 194, 198-201, 54 P 807, is clear authority for the rule that the prosecuting attorney may exercise his descretion and refuse to call witnesses, even though they be eye witnesses to the crime, whose testimony, in his judgment, is not worthy of belief, and that his failure to call them does not constitute suppression of evidence. Here, as in the Barrett case, there was no endeavor to prevent the witnesses in question from appearing and testifying on the trial. Counsel for defense knew about them and did call them, and they did testify.

But, though the prosecutor acted under severe provocation and in the face of an unwarranted charge reflecting on his honor and integrity as an officer of the court, his conduct in stating in the hearing of the jury that he had a confession of the defendant in his hand, and demanding that the court introduce it in evidence, is not for that reason to be condoned nor any the less prejudicial in its consequences. The writing was not a confession at all, and, even though it had

been, it was hearsay and not admissible in evidence. The state does not claim that it was admissible. In fact, as we view the record, no such claim was made for it on the trial, but, rather, the angry words of the prosecutor which we have quoted were in the nature of a challenge to the judge to introduce incompetent evidence favoring the state, since he had already introduced incompetent evidence favoring the defendant.

It is unnecessary further to characterize the incident. The trial judge himself the next day expressed the opinion that he probably should have granted a mistrial. We think that failure to do so was reversible error.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.